# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00629-CV

**J.P. Morgan Chase Bank, N.A., successor by merger to Bank One, N.A.; and Michael Bobinchuck, Appellants**

**v.**

**Texas Contract Carpet, Inc.; Gypsum Floors of Texas, Inc.; and Agape Round Rock Housing, Inc., d/b/a Chandler Creek Apartments, Appellees**

### FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 277TH JUDICIAL DISTRICT NO. 02-737-C277, HONORABLE KEN ANDERSON, JUDGE PRESIDING

## O P I N I O N

Appellants J.P. Morgan Chase Bank, N.A., successor by merger to Bank One, N.A., ("JP Morgan") and Michael Bobinchuck appeal from a trial-court judgment in favor of several parties, including appellees, Texas Contract Carpet, Inc. ("Contract Carpet"); Gypsum Floors of Texas, Inc. ("Gypsum"); and Agape Round Rock Housing, Inc., d/b/a Chandler Creek Apartments, ("Agape"). The dispute arises from the contractual relationships established among the parties for the construction of a low-income apartment complex in Round Rock. The parties' roles regarding the project were as follows: JP Morgan was the lender; Agape was the owner; Bobinchuck was the vice president of AMHC Construction, which was the general contractor; and Contract Carpet and Gypsum were subcontractors. Agape and several of the subcontractors, including Contract Carpet and Gypsum, filed suit against JP Morgan, Bobinchuck, and various other parties after JP Morgan

declined to release funds in response to Agape's thirteenth draw request. After a bench trial, the trial court ruled in favor of Agape and Gypsum on their claims against Bobinchuck and in favor of the subcontractors on their claims against JP Morgan.

JP Morgan and Bobinchuck raise several issues on appeal. JP Morgan complains that the evidence is legally and factually insufficient to support the trial court's findings of fact and conclusions of law that JP Morgan (1) served as an agent of Agape and, as an agent, violated a statutory duty to withhold retainage in the construction account; (2) misapplied trust funds under the Texas Trust Fund Act; (3) was negligent and grossly negligent in failing to withhold retainage in the construction account; (4) violated a fiduciary duty to the subcontractors; and (5) converted the subcontractors' funds. Bobinchuck complains that the evidence is legally and factually insufficient to support the trial court's conclusions that: (1) he was a trustee and misapplied trust funds under the Texas Trust Fund Act; and (2) his conduct was so egregious as to justify an award of exemplary damages against him.

Because we conclude that the evidence is legally and factually insufficient to support the trial court's judgment on each of the issues raised on appeal, we reverse the trial court's judgment with respect to those issues. The remainder of the judgment, which contains several rulings that were not challenged on appeal, remains intact.

**BACKGROUND**

In October 2000, JP Morgan entered into a contract with Agape enabling Agape to access up to $16.2 million for the construction of a low-income apartment complex in Round Rock called the Chandler Creek Apartments ("the Chandler Creek Project"). The funds became available

as a result of a loan agreement between Agape and Capital Area Housing Finance Corporation ("Capital Area"), a public, nonprofit housing finance corporation authorized under the Housing Finance Corporations Act ("the Housing Act") to issue bonds for the purpose of loaning the proceeds of the bonds to other entities for the development of low-income housing projects. *See* Tex. Loc. Gov't Code Ann. §§ 394.001-.907 (West 2006). Pursuant to the Housing Act, the bonds issued by Capital Area and any income from the bonds were tax-exempt. *See id*. § 394.905. In the loan agreement between Capital Area and Agape, Capital Area agreed to loan the proceeds of the sale of certain bonds to Agape in order to finance costs of the acquisition, construction, and equipping of the Chandler Creek Project. Capital Area assigned its rights under the loan agreement to JP Morgan, who became trustee of the funds pursuant to a trust indenture between Capital Area and JP Morgan.[1] Also, in the contract between JP Morgan and Agape ("the construction agreement"), JP Morgan agreed to issue a letter of credit in the amount of $15.8 million in favor of the owner of the bonds, Charter MAC Equity Issuer Trust ("the bondholder"). Thus, JP Morgan entered into the construction agreement in two roles: (1) as trustee of the bonds, and (2) as letter-of-credit provider.

JP Morgan initially deposited $14.1 million into an account from which it would draw funds to pay Agape for costs related to the Chandler Creek Project ("the construction account"). Pursuant to the construction agreement, JP Morgan agreed to release the funds to Agape in installments provided that Agape met certain specified conditions at the time of each of its draw requests. The construction agreement specifically provided that JP Morgan could withhold or refuse

---

[1] Such a trust indenture is authorized by the Housing Finance Corporations Act, which further states that a trust indenture "may provide that the remedies and rights to enforcement may be vested in a trustee, with full power of appointment, for the benefit of all the bondholders." *See* Tex. Loc. Gov't Code Ann. § 394.054 (West 2006).

to fund any of Agape's draw requests if "any mechanic's lien or notice of intention to record or file a mechanic's lien [had] been filed or established, unless [Agape] [had] posted a bond or other security acceptable to [JP Morgan] sufficient to discharge such lien in full."

The construction agreement also included a provision regarding JP Morgan's responsibility to disburse "retainage" from the construction account:

> In addition to the conditions hereinbefore set forth in this Section, [JP Morgan] shall approve disbursement of the Retainage thirty-one (31) days after each of the following events have occurred: (i) Servicer and [JP Morgan] have received evidence of Completion; and (ii) an Affidavit of Completion that complies with the Texas Property Code has been filed of record in the County where the Project is located; provided, however, at the written request of [Agape] and Developer, [JP Morgan] shall approve disbursement of Retainage for each subcontractor of Contractor thirty (30) days following final completion of that subcontractor's work.

The construction agreement defined "Retainage" as "[a] holdback of ten percent (10%) of the Direct Costs of construction."

After entering into the construction agreement with JP Morgan, Agape contracted with AMHC Construction, Inc. ("AMHC"), a general contractor, in which AMHC became responsible for the construction of the Chandler Creek Project. In the contract, Agape agreed to pay AMHC $10.2 million for constructing the project. Robert Bobinchuck was the president and sole shareholder of AMHC, and his son, Appellant Michael Bobinchuck, was vice president.[2] Two months later, AMHC entered into a contract with American Multi Construction, Inc. ("American Multi") in which American Multi became the prime contractor for the project. Robert

---

[2] Robert Bobinchuck passed away sometime after trial. When we refer to him in the rest of this opinion, we use his full name. When we use only "Bobinchuck" in the rest of the opinion, we do so in reference to Appellant Michael Bobinchuck.

Bobinchuck was an officer of both AMHC and American Multi and testified at trial that the purpose of the contract between the two companies was for him to maintain better control over the cash flow regarding the project. After contracting with AMHC, American Multi entered into contracts with various subcontractors, including Contract Carpet and Gypsum.

Construction on the Chandler Creek Project began in early 2001 and was completed in January or February 2002. During that time, Agape submitted twelve draw requests to JP Morgan, each of which JP Morgan approved, resulting in the release of approximately $9.8 million from the construction account. Each of the draw requests was submitted to multiple entities before submission to JP Morgan, and by the time each request reached JP Morgan, it included various representations made by AMHC and Agape. For example, AMHC stated that it "represent[ed] and warrant[ed] that all persons or entities who [had] furnished labor or material to [AMHC] in connection with the Work performed through the date [t]hereof [had] been paid all amounts to which they [had] become entitled, excepting agreed retainage not yet due and payable." Agape's representations included one in which it stated that it represented and warranted that "with the exception of any Permitted Liens, there are no liens against any portion of the Project or any other asset of [Agape]."

After releasing funds in response to Agape's twelfth draw request, JP Morgan became aware that several of the subcontractors had not been paid for their work and had filed affidavits claiming liens on the property. At that point, Agape's construction consultant advised JP Morgan and Agape that they should not release any further funds until they received proof that the subcontractors had been paid and had released their liens. In February 2002, AMHC submitted a

5

thirteenth draw request, this time bypassing intermediaries and submitting it directly to JP Morgan. Thus, the draw request did not contain the usual representations from Agape. JP Morgan did not release funds in response to the draw request, and in a letter to Agape in March 2002, JP Morgan explained that Agape's failure to complete the project by the completion date constituted an "event of default" under the construction agreement. JP Morgan also stated in the letter that the remaining funds in the construction account were insufficient to pay project costs and other costs associated with the Chandler Creek Project. As a result, JP Morgan demanded that Agape promptly pay all of the remaining costs of the project, including all amounts necessary to remove the subcontractors' liens on the property.

Also in March 2002 and in response to Agape's default, the bondholder instructed JP Morgan to draw on the $15.8 million letter of credit to pay the bondholder the interest due at that time. JP Morgan did so and took possession of the bonds as collateral for the amount still owed by Agape under the loan. After consulting with a tax specialist, JP Morgan decided not to release any further funds to Agape under the construction agreement based on the specialist's advice that doing so would cause the bonds to lose their tax-exempt status, jeopardizing JP Morgan's ability to sell them.[3] In December 2003, JP Morgan sold the bonds for $12 million, accepting a $4 million loss. Although $864,127.48 remained in the construction account in March 2004, the money was part of the bond package sold for $12 million in December 2003. The $864,127.48 was subsequently transferred out of the account.

---

[3] The record does not indicate why further payments to Agape would cause the bonds to lose their tax-exempt status.

6

Meanwhile, back in December 2002, Agape filed suit against American Multi, AMHC, Robert Bobinchuck, Michael Bobinchuck, all of the subcontractors, and various other parties. In its suit, Agape sought to have the trial court quiet title to the Chandler Creek Project, alleged that the subcontractors filed defective liens, and sought a declaratory judgment that the subcontractors' mechanic's and materialman's liens were void. Agape also brought claims against the various other parties, seeking damages for breach of contract, negligent misrepresentation, fraud, conspiracy, breach of fiduciary duty, and misapplication of trust funds.

In April 2004, Gypsum brought a third-party action against JP Morgan, asserting claims for breach of contract, misapplication of trust funds, breach of fiduciary duty, negligence per se, negligence, negligent performance of contract, conversion, and misapplication of fiduciary property. Two months later, Contract Carpet also brought a third-party action against JP Morgan, bringing claims for breach of contract and misapplication of trust funds. Several other subcontractors later filed suit, bringing claims similar to those of Gypsum and Contract Carpet. In addition, Agape filed cross-claims against JP Morgan for breach of contract, misapplication of trust funds, breach of fiduciary duties, and misapplication of fiduciary property.

The case was set for a bench trial in May 2005. Before testimony began, AMHC, American Multi, and various other affiliated entities confessed judgment in the amount of $369,295 on the claims asserted against them by Agape. In addition, Agape non-suited its cross-claims against JP Morgan. The trial court proceeded with trial, and after Agape rested, the trial court directed a verdict against Agape with respect to Agape's defective-lien claims and claims to quiet title and for declaratory judgment against the subcontractors. After the completion of trial, the trial court

7

rendered a final judgment in favor of the subcontractors on their claims against JP Morgan for misapplication of trust funds, breach of fiduciary duty, conversion, negligence, and gross negligence. The trial court awarded damages and exemplary damages to the subcontractors. The trial court also rendered judgment in favor of Gypsum on its claim against Michael Bobinchuck for misapplication of trust funds and awarded Gypsum damages and exemplary damages. In addition, the trial court rendered judgment in favor of Agape on its claim against Michael Bobinchuck for misapplication of trust funds and awarded Agape damages.

Agape, JP Morgan, and Bobinchuck appealed from the trial court's final judgment. After filing notices of appeal, Agape, JP Morgan, and four of the subcontractors filed a joint motion for partial dismissal of their appeal, asserting that they had resolved all disputes between and among themselves. Agape also filed a separate motion to dismiss its appeal against another subcontractor. We granted both motions and dismissed the specified claims. The only claims remaining on appeal after we severed the dismissed claims are those among Appellants JP Morgan and Bobinchuck and Appellees Contract Carpet, Gypsum, and Agape. JP Morgan's claims on appeal challenge the sufficiency of the evidence to support the trial court's determinations that JP Morgan: (1) served as an agent of Agape and, as an agent, violated a statutory duty to withhold retainage in the construction account; (2) misapplied trust funds under the Texas Trust Fund Act; (3) was negligent and grossly negligent in failing to withhold retainage in the construction account; (4) violated a fiduciary duty to the subcontractors; and (5) converted the subcontractors' funds. Bobinchuck's claims on appeal challenge the sufficiency of the evidence to support the trial court's conclusions that: (1) he was a trustee and misapplied trust funds under the Texas Trust Fund Act; and (2) his conduct was so

8

egregious as to justify an award of exemplary damages against him. We address each of the issues below.

## STANDARD OF REVIEW

Although the appellants do not so characterize their challenges, it appears from their arguments that they challenge the sufficiency of the evidence to support several of the trial court's findings of fact and conclusions of law. In an appeal from a bench trial, the trial court's findings of fact have the same force and dignity as a jury's verdict and are reviewable for legal and factual sufficiency under the same standards as are applied to the review of a jury verdict. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991); *Ludwig v. Encore Med., L.P.*, 191 S.W.3d 285, 294 (Tex. App.—Austin 2006, pet. denied).

When reviewing a finding for legal sufficiency, we must credit evidence favorable to the judgment if a reasonable fact-finder could, disregard contrary evidence unless a reasonable fact-finder could not, and reverse the fact-finder's determination only if the evidence presented in the trial court would not enable a reasonable and fair-minded fact-finder to reach the judgment under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We will sustain the appellants' legal-sufficiency challenges if the record reveals: (1) the complete absence of evidence of a vital fact; (2) that the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) that the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) that the evidence conclusively establishes the opposite of a vital fact. *See id*. at 810. More than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable

9

and fair-minded people to differ in their conclusions. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

When considering a factual-sufficiency challenge, we consider all the evidence and set aside the judgment only if it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). Under either standard of review, we must be mindful that the trial court as finder of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *Raymond v. Rahme*, 78 S.W.3d 552, 556 (Tex. App.—Austin 2002, no pet.). The trial court may choose to believe one witness and disbelieve another, and we must not impose our own opinion to the contrary. *City of Keller*, 168 S.W.3d at 819.

We review the trial court's conclusions of law de novo. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). Although appellants may not challenge a trial court's conclusions of law for factual sufficiency, we may review the trial court's legal conclusions drawn from the facts to determine whether the conclusions are correct. *Id*.

## ISSUES RAISED BY JP MORGAN

*Agency Relationship*

In its first issue, JP Morgan contends that the trial court erred in determining that JP Morgan acted as Agape's agent with regard to the statutory duty to retain ten percent of the contract price of the project. *See* Tex. Prop. Code Ann. § 53.101 (West 2007) (imposing duty to retain funds on owner of project or owner's agent, trustee, or receiver). The specific finding of fact challenged by JP Morgan states that "[u]nder the [construction agreement], [JP Morgan] acted as the

10

agent for [Agape] in regard to withholding retainage." JP Morgan argues that section 53.101 imposes the duty to retain funds on Agape as the owner of the project and that there is no evidence that Agape delegated the duty to JP Morgan as an agent or that JP Morgan accepted any such delegation.

To be an agent, a person must (1) act for and on behalf of another person and (2) be subject to that person's control. *Stanford v. Dairy Queen Prods.*, 623 S.W.2d 797, 801 (Tex. App.—Austin 1981, writ ref'd n.r.e.). Both elements are required; "the absence of one will prevent the conclusion that an agency relationship exists." *Id.*; *see also Daily Int'l Sales Corp. v. Eastman Whipstock, Inc.*, 662 S.W.2d 60, 64 (Tex. App.—Houston [1st Dist.] 1983, no writ) (person is not agent unless subject to another party's control); Restatement (Second) of Agency § 1 cmt. e (1958) ("'Agent' is a word used to describe a person authorized by another to act on his account and under his control."). The party claiming agency must prove that the principal has both the right to assign the agent's task and the right to control the means and details by which the agent will accomplish the task. *Lyons v. Lindsey Morden Claims Mgmt., Inc.*, 985 S.W.2d 86, 90 (Tex. App.—El Paso 1998, no pet.).

Contract Carpet and Gypsum ("the subcontractors") allege an agency relationship specifically with regard to the statutory duty to retain a certain amount of funds in the construction account. The requirement to withhold "retainage" for the benefit of lien claimants is set forth in the property code as follows:

> (a) During the progress of work under an original contract for which a mechanic's lien may be claimed and for 30 days after the work is completed, the owner shall retain:

11

> (1) 10 percent of the contract price of the work to the owner; or
>
> (2) 10 percent of the value of the work, measured by the proportion that the work done bears to the work to be done, using the contract price or, if there is no contract price, using the reasonable value of the completed work.
>
> (b) In this section, "owner" includes the owner's agent, trustee, or receiver.

Tex. Prop. Code Ann. § 53.101.

The subcontractors concede that Agape, as the owner of the project, would ordinarily be responsible for retaining funds in the construction account pursuant to the statute. However, the subcontractors argue that the construction agreement created an agency relationship between Agape and JP Morgan with regard to the duty to retain funds and that JP Morgan accepted the duty to retain the funds as Agape's agent. As support for their position, the subcontractors point to two provisions of the construction agreement that allegedly demonstrate JP Morgan's acceptance of Agape's statutory duty to withhold retainage. The first provision states that "[JP Morgan] shall make all decisions in connection with the day-to-day administration of the Construction Matters without the requirement of any further approval of or consent to such decisions by [Related Charter LP, the mortgage servicer appointed to service the loan]." The second provision defines "Construction Matters" as:

> All rights and obligations of the Majority Owner and Servicer under this Agreement and the Bond Documents during the Construction Period concerning the construction of the Project, including approval of construction draws, inspection of the Project, *holding and disbursing retainage*, approving Change Orders, approval of construction contracts and subcontracts and amendments thereto, and reallocation of certain amounts set forth in the Development Budget.

12

(Emphasis added.) The subcontractors also point to the deposition of Dana Ogden, JP Morgan's construction risk administrator for the project, in which Ogden testified that she was the person at JP Morgan responsible for verifying the amount retained in the construction account, determining whether retained funds should be released, and authorizing their release.[4] She also testified that she was responsible for ensuring that JP Morgan complied with the laws of Texas, including laws regarding retainage, and that she was not aware of any document authorizing JP Morgan to retain less than ten percent of each draw request.

Considering all of the evidence pertaining to the relationship between JP Morgan and Agape with regard to the duty to withhold retainage in the construction account, we cannot conclude that JP Morgan acted as Agape's agent. Although there is evidence of the first requirement of an agency relationship, that JP Morgan agreed to act on behalf of Agape in withholding retainage, there is no evidence of the second requirement, that JP Morgan was subject to Agape's control in accomplishing the task. To the contrary, considerable evidence supports a conclusion that it was JP Morgan, not Agape, that maintained sole control of the funds in the construction account and sole control over whether to release retainage from the account. For example, the construction agreement states that JP Morgan could:

> make any or all Advances (a) for Direct Costs incurred under the Construction Contract directly to Contractor for deposit in an appropriately designated special bank account, (b) through the Title Insurance Company, or (c) to any Person set forth in a Requisition or to whom [JP Morgan] . . . in good faith determines payment is due.

---

[4] Ogden later contradicted her deposition testimony at trial, testifying that she was not responsible for managing and maintaining retainage in the construction account.

The construction agreement goes on to state that "[t]he execution of this Agreement by [Agape] shall, and hereby does, constitute an irrevocable authorization to [JP Morgan] . . . to make such Advances, and no further authorization from [Agape] . . . shall be necessary." In addition, the construction agreement states that JP Morgan would make all decisions in connection with the daily administration of construction matters, including the withholding of retainage. Thus, according to the construction agreement, Agape had no control over the duty to withhold retainage.

In addition to the written agreement, testimonial evidence also shows JP Morgan's sole control over the construction account and the maintenance of retainage. Brian Tuerff, JP Morgan's senior vice president, testified in his deposition and at trial that JP Morgan, and Ogden specifically, was responsible for calculating and releasing retainage. Further, as previously indicated, Ogden testified in her deposition that she was the person at JP Morgan responsible for managing and maintaining retainage in the construction account. Ogden also testified that she received the draw requests from Agape and that she was responsible for approving or denying the requests. Laura Wingfield, the executive director of Agape, testified that Agape never had any control over the construction funds and that the funds were never in an Agape account. She further testified that Agape relied on JP Morgan to properly distribute the funds, that the sole authority for distributing money from the account rested with JP Morgan, and that it was her understanding that JP Morgan was withholding retainage in the account. The record contains no evidence to the contrary.

Given that there is no evidence of the vital fact that JP Morgan was subject to Agape's control, we conclude that the evidence is legally insufficient to support the trial court's finding that JP Morgan served as Agape's agent with regard to the duty to withhold retainage. *See*

14

*City of Keller*, 168 S.W.3d at 810; *Stanford*, 623 S.W.2d at 801. Further, because there is no evidence of Agape's control over JP Morgan and considerable evidence to the contrary, we also conclude that the evidence is factually insufficient to support the trial court's finding.[5] *See Cain*, 709 S.W.2d at 176. Because JP Morgan was not Agape's agent, it was under no statutory duty to withhold retainage in the construction account. *See* Tex. Prop. Code Ann. § 53.101.[6]

***Texas Construction Trust Fund Act***

In its second issue, JP Morgan asserts that the trial court erred in applying the Texas Construction Trust Fund Act ("the Act") to JP Morgan. *See* Tex. Prop. Code Ann. §§ 162.001-.033 (West 2007 & Supp. 2009). The trial court first applied the Act to JP Morgan in its finding of fact tracking the Act's definition of "trust funds," stating that "[t]he retainage funds held by [JP Morgan] in the construction loan account were loan receipts of funds borrowed by [Agape] for the purpose of constructing the Chandler Creek Apartments on the Property." The trial court further applied the Act to JP Morgan in another finding of fact tracking language in the Act, stating that JP Morgan "intentionally or knowingly, directly or indirectly, retained, used, disbursed or otherwise diverted trust funds without first paying all current or past due obligations owed to the Subcontractors." On

---

[5] In another argument against the existence of an agency relationship, JP Morgan asserts that the retainage referred to in the construction agreement was different from and unrelated to the statutory retainage required under Chapter 53 of the property code. However, because we have already concluded that the evidence is insufficient to establish an agency relationship, we need not address JP Morgan's additional argument. *See* Tex. R. App. P. 47.1.

[6] As part of this issue, JP Morgan also contends that the funds in the construction account were the property of the bondholder, not the subcontractors. However, we do not address the argument here because it is not necessary to do so in order to determine whether an agency relationship existed. We do, however, address the argument later in this opinion with respect to the subcontractors' conversion claim against JP Morgan.

appeal, JP Morgan argues that (1) whether the funds were "trust funds" under the Act is irrelevant because JP Morgan is exempt from the Act's requirements, and (2) even if JP Morgan were not exempt, the funds in the construction account were undisbursed bond proceeds held for the benefit of the bondholder and thus could not be considered "trust funds" under the Act. *See id*. § 162.001 (West Supp. 2009).[7]

We first address the question of JP Morgan's exemption from the Act, which requires us to construe the Act's exemption provision. *See id*. § 162.004(a)(1) (West Supp. 2009). Statutory construction is a question of law that we review de novo. *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). In resolving an issue of statutory construction, we are required, first and foremost, to follow the plain language of the statute. *Texas Health Ins. Risk Pool v. Southwest Serv. Life Ins. Co.*, 272 S.W.3d 797, 801 (Tex. App.—Austin 2008, no pet.). We read every word, phrase, and expression in a statute as if it were deliberately chosen, and we presume that words excluded from

---

[7] Section 162.001 defines "trust funds" as follows:

(a)     Construction payments are trust funds under this chapter if the payments are made to a contractor or subcontractor or to an officer, director, or agent of a contractor or subcontractor, under a construction contract for the improvement of specific real property in this state.

(b)     Loan receipts are trust funds under this chapter if the funds are borrowed by a contractor, subcontractor, or owner or by an officer, director, or agent of a contractor, subcontractor, or owner for the purpose of improving specific real property in this state, and the loan is secured in whole or in part by a lien on the property.

Tex. Prop. Code Ann. §162.001 (West Supp. 2009).

the statute are done so purposefully. *Gables Realty Ltd. P'ship v. Travis Cent. Appraisal Dist.*, 81 S.W.3d 869, 873 (Tex. App.—Austin 2002, pet. denied).

The exemption provision states that the Act "does not apply to a bank, savings and loan, or other lender." Tex. Prop. Code Ann. § 162.004(a)(1). JP Morgan is a bank and was the entity loaning the money for the project. Thus, according to the plain language of the provision, the Act does not apply to JP Morgan. *See Republicbank Dallas, N.A. v. Interkal, Inc.*, 691 S.W.2d 605, 607 (Tex. 1985); *Heldenfels Bros., Inc. v. First Nat'l Bank*, 657 S.W.2d 883, 885 (Tex. App.—Corpus Christi 1983, writ ref'd n.r.e.); *see also Exchanger Contractors Inc. v. Comerica Bank-Tex*, 330 F.3d 339, 341 (5th Cir. 2003) (holding that lender bank had priority over subcontractor to money held by owner because bank exempted from Act).

The subcontractors assert that *Interkal* does not apply to this case because the *Interkal* court considered a former version of section 162.004 that was later amended. The former version of section 162.004 stated that "[t]his Act shall have no application to any bank, savings and loan association or other lender . . . in connection with any transaction to which this Act is applicable." *See Interkal*, 691 S.W.2d at 606 n.1. In the current version of the provision, the clause "in connection with any transaction to which this Act is applicable" has been removed, leaving language stating only that the Act "does not apply to a bank, savings and loan, or other lender." *See* Tex. Prop. Code Ann. § 162.004(a)(1). The subcontractors argue that the removal of the clause from the statute considerably narrows the exemption. However, they do not cite, and we have not found, any legal authority to support such a proposition. To the contrary, a Texas Attorney General opinion issued in 1988 cited *Interkal* as the correct interpretation of the provision even though *Interkal* addressed

17

the previous version of the provision.  *See* Op. Tex. Att'y Gen. No. JM-945 (1988).  Further, the removal of the clause from the provision does not affect the plain language of the remaining words, which clearly state that the Act does not apply to banks.  *See* Tex. Prop. Code Ann. § 162.004(a)(1).

Despite the plain language of the statute, the subcontractors contend that the Act should nevertheless apply to JP Morgan because JP Morgan acted as Agape's agent, and not as a bank, with regard to the issue of retainage.  However, we have already determined that JP Morgan was not Agape's agent in this context.

The subcontractors further argue that we should not follow the plain language of the provision because doing so would lead to an absurd result.  *See Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 177 (Tex. 2004); *Sharp v. House of Lloyd, Inc.*, 815 S.W.2d 245, 249 (Tex. 1991).  According to the subcontractors, a plain-language interpretation of the provision would lead to the allegedly absurd result of allowing a bank to take on the attributes of an owner in a construction project while also permitting the bank to avoid all the responsibilities imposed upon an owner under the Act.  We disagree.  In this case, Agape freely contracted with JP Morgan in such a way as to give JP Morgan control over the construction account.  Later, when the subcontractors took legal action on their unpaid bills, they learned that JP Morgan is exempt from the Act's provisions.  Although the specific circumstances of this case may have led to an undesirable result for the subcontractors, the circumstances do not create an absurd result out of the plain-language of the statute.  At most, they demonstrate a gap or oversight in the statute that, if true, must be corrected by the legislature, not the courts.  *See Brown v. De La Cruz*, 156 S.W.3d 560, 566 (Tex. 2004) ("It is at least theoretically possible that legislators—like judges or anyone

18

else—may make a mistake. That does not give us the power to legislate to fill any hiatus [the legislature] has left.").

Further, although the subcontractors may consider the statute unfair under the circumstances of this case, whether a statute is fair or makes the most sense are questions for the legislature to consider, not the courts. *See Hughes*, 246 S.W.3d at 629 ("[O]ur standard for construing statutes is not to measure them for logic [but to] construe [them] to effectuate the intent of the [l]egislature, with the language of the statute as it was enacted to be our guide unless the context or an absurd result requires another construction.").

Based on our holding that the plain language of the Act exempts JP Morgan from the Act's provisions and our rejection of the subcontractors' arguments that we should depart from a plain-language interpretation of the Act, we hold that the trial court erred in applying the Act to JP Morgan. Consequently, we reverse all of the trial court's findings of fact or conclusions of law applying the Act to JP Morgan. Because we hold that the Act does not apply to JP Morgan, we need not reach JP Morgan's second argument that the funds in the construction account were not "trust funds" under the Act.

### Negligence

In its third issue, JP Morgan contends that the trial court erred in issuing a finding of fact that "[JP Morgan] was negligent in failing to exercise reasonable care in disbursing retainage funds from the construction loan account, prior to completion of the project." To prove negligence, a party must establish: (1) the existence of a legal duty; (2) a breach of that duty; and (3) damages proximately caused by the breach. *Southwestern Elec. Power Co. v. Grant*, 73 S.W.3d 211, 223

19

(Tex. 2002) (Enoch, J., concurring) (quoting *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990)). Duty is the "threshold inquiry in a negligence case." *Id*. "In the absence of a duty, there can be no negligence." *Id*. at 224. JP Morgan challenges only the existence of a legal duty, arguing that the evidence is insufficient to support the trial court's conclusion of law that "[JP Morgan] owed a duty to the Subcontractors to exercise reasonable care in disbursing the retainage funds from the construction loan account."

A duty can be assumed by contract or imposed by law. *Id*. at 223. In their petitions, the subcontractors alleged that JP Morgan had a duty to the subcontractors based on: (1) the construction agreement between JP Morgan and Agape; (2) section 53.101 of the property code; and (3) the Act. On appeal, the subcontractors do not reference the construction agreement, section 53.101, or the Act, but instead offer a different contention: that this court should adopt a new common-law duty of reasonable care to be imposed upon financial institutions such as JP Morgan under the circumstances of this case. We address each of the subcontractors' allegations in turn.

## A. Whether Duty Assumed by Contract

At trial, the subcontractors argued that JP Morgan breached a duty to them that was established in the contract between JP Morgan and Agape. Because the subcontractors were not parties to the contract, they bring their claim as third parties. A third party may recover on a contract made between other parties only if the contracting parties: (1) intended to secure a benefit to the third party, and (2) entered into the contract directly for the third party's benefit. *Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex. 2002). A third party does not have the right to enforce a contract if it received only an incidental benefit. *Id*. "A court will not create a third-party beneficiary contract

20

by implication." *Id*. (quoting *MCI Telecomms. Corp. v. Texas Util. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999)). An agreement must clearly and fully express an intent to confer a direct benefit on the third party. *Id*. Thus, there is a presumption that parties contracted for their own benefit unless it clearly appears that they intended a third party to benefit from the contract. *See MCI*, 995 S.W.2d at 651. Any doubts must be resolved against finding the existence of a third-party beneficiary. *See Raymond*, 78 S.W.3d at 561. To determine the parties' intent, courts must examine the entire contract and give effect to all the contract's provisions. *See MCI*, 995 S.W.2d at 652.

To qualify as a third-party beneficiary, a party must show that it is either a "donee" or "creditor" beneficiary of the contract. *Id*. at 651. A party is a donee beneficiary if the performance promised in the contract, when rendered, is a "pure donation" to that party. *Id*. On the other hand, a party is a creditor beneficiary if the performance promised in the contract is rendered in satisfaction of a legal duty owed to that party. *Id*. The legal duty may be an indebtedness, contractual obligation, or other legally enforceable commitment owed to the third party. *Id*. Based on the circumstances of this case, we must determine whether the subcontractors qualify as creditor beneficiaries.

JP Morgan contends that the subcontractors cannot be third-party beneficiaries of the construction agreement because the plain language of the agreement specifically disavows the existence of third-party beneficiaries. The parties express the disavowal in a section of the construction agreement titled "Rights of Third Parties"[8]:

---

[8] In all quotations from the construction agreement, both the words "Trustee" and "Bank" refer to JP Morgan, but the use of "Trustee" indicates a reference to JP Morgan in its role as trustee pursuant to the trust indenture between Capital Area and JP Morgan.

(a)     All conditions to the performance of the obligations of Servicer, Trustee and Bank under this Agreement, including the obligation to authorize Advances, are imposed solely and exclusively for the benefit of Servicer, Trustee and Bank and the Majority Owner (who shall be a third party beneficiary hereof), and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Servicer, Trustee or Bank will refuse to approve Advances in the absence of strict compliance with any or all thereof, and no other Person shall, under any circumstances, be deemed to be a beneficiary of such conditions, any and all of which may be freely waived in whole or in part by Servicer, Trustee or Bank at any time if in its sole discretion it deems it desirable to do so. In particular, Servicer, Trustee and Bank make no representations and assumes [sic] no obligations as to third parties concerning the quality of the construction by [Agape] of the Improvements or the absence therefrom of defects.

(b)     All of the obligations of [Agape] under this Agreement are imposed for the benefit of Trustee, Servicer and Bank.

In another section of the construction agreement, a separate provision further expresses the intended beneficiaries:

The covenants and agreements of Servicer, Bank and Trustee under this [article] are intended exclusively for the benefit of such parties, and no covenant, warranty, representation or undertaking of Trustee, Servicer or Bank, or any of them, under this [article] shall be deemed to create any duty or obligation on the party [sic] of such party for the benefit of any other party, including the Obligors, except for Trustee, Servicer or Bank, respectively; and no act or omission on the party [sic] of Trustee, Servicer or Bank under this [article] shall create any liability on the party [sic] of such party to or be the basis for a claim against such party by, through or under the Obligors, or any of them.

The Texas Supreme Court considered a contractual disavowal of third-party beneficiaries in *MCI* and stated that "[i]n light of the clear language in the contract that the agreement not be construed as being for the benefit of any nonsignatory, we conclude that [the plaintiff] is not a third-party beneficiary." 995 S.W.2d at 651. We reach the same conclusion here,

22

holding that the clear language in the construction agreement disavowing third-party beneficiaries other than the bondholder defeats the subcontractors' third-party claims.

Further, none of the other provisions in the construction agreement clearly and fully express an intent to confer a direct benefit on the subcontractors. *See Stine*, 80 S.W.3d at 589. In fact, the subcontractors do not cite to any specific provisions of the construction agreement that would support their contention that they were third-party beneficiaries. In the trial court, they argued generally that "the provisions of the [construction agreement] that allowed for payment directly to parties entitled to receive payment was a direct reflection of intention that third parties such as the Subcontractors would be paid directly." In reviewing the construction agreement with that contention in mind, we have determined that the following provisions are the only ones to which the subcontractors could have been referring:

> At its option, Bank may direct Trustee to make any or all Advances (a) for Direct Costs incurred under the Construction Contract directly to Contractor for deposit in an appropriately designated special bank account, (b) through the Title Insurance Company, or (c) to any Person set forth in a Requisition or to whom Bank . . . in good faith determines payment is due.

> [Agape] will diligently pursue construction of the Improvements in accordance with the Construction Schedule, will attain Completion on or prior to the Completion Date as may be extended in accordance with this Agreement, and will pay all sums and perform all such acts as may be necessary or appropriate to complete such construction . . .

> [Agape] will duly pay and discharge, or cause to be paid and discharged, before the same shall become overdue all claims for labor, materials, or supplies that if unpaid might by law become a lien or charge upon any of its property . . .

> [Agape] will use the proceeds of the Tax-Exempt Bonds solely for the purpose of (i) funding the Debt Service Reserve Fund and (ii) paying for Project Costs (as defined

23

in the Indenture) related to activities that do not constitute unrelated trades or businesses of [Agape] . . .

[Agape] will furnish or cause to be furnished to Bank or Servicer, upon written request at any time, and from time to time, affidavits listing all laborers, subcontractors, materialmen, and any other Persons who might or could claim statutory or common law liens and are furnishing or have furnished labor or material to the Project or any part thereof, together with affidavits, or other evidence satisfactory to Bank or Servicer, showing that such parties have been paid all amounts then due for labor and materials furnished to the Project.

Although the provisions acknowledge that subcontractors would be paid out of the funds in the account, none of the provisions clearly and fully express an intent to confer a benefit on the subcontractors. *See id*.

Because the construction agreement in this case contains an explicit disavowal of any third-party beneficiaries, and because there is no clear indication in the agreement that Agape and JP Morgan intended to confer a direct benefit on the subcontractors, we conclude that the subcontractors were not third-party beneficiaries of the agreement and that the subcontractors therefore cannot recover under the construction agreement. *See MCI*, 995 S.W.2d at 651; *Stine*, 80 S.W.3d at 589.

**B.     Whether Duty Imposed by Chapter 53 of the Property Code**

The subcontractors contend that the retainage provision in Chapter 53 of the property code imposed a duty on JP Morgan to withhold retainage in the construction account. *See* Tex. Prop. Code Ann. § 53.101 (requiring owner of project or owner's agent, trustee, or receiver to withhold ten percent of contract price of work or ten percent of value of work during progress of work and for thirty days after work is completed). In the trial court, the subcontractors argued that JP Morgan had

24

a duty to retain funds under section 53.101 because JP Morgan acted as Agape's agent. However, we have already determined that JP Morgan did not act as Agape's agent because Agape had no control over JP Morgan's actions with regard to retainage. *See Stanford*, 623 S.W.2d at 801 (requiring party to be subject to other party's control in order to be other party's agent). Accordingly, section 53.101 of the property code did not impose a duty on JP Morgan.

###### C.      Whether Duty Imposed by Texas Trust Fund Act

The subcontractors also contend that the Act imposed a duty on JP Morgan to not misapply trust funds. *See* Tex. Prop. Code Ann. § 162.002 (West 2007), §§ 162.003, 162.031 (West Supp. 2009). However, as previously indicated, the Act does not apply to JP Morgan because JP Morgan, as a bank and lender, is explicitly exempted from the chapter. *See id*. § 162.004 (stating that the Act does not apply to "a bank, savings and loan, or other lender"). Even if JP Morgan were not exempt, the chapter still would not impose a duty on JP Morgan because the bank does not fall within the chapter's definition of "trustee." *See id*. § 162.002 (West 2007) (defining "trustee" as "[a] contractor, subcontractor, or owner or an officer, director, or agent of a contractor, subcontractor, or owner, who receives trust funds or who has control or direction of trust funds"). The subcontractors do not contend that JP Morgan was the contractor, subcontractor, or owner of the project, nor do they contend that JP Morgan was the agent of the contractor or subcontractors. They contend only that JP Morgan was the agent of the owner, Agape, and we have already determined that no agency relationship existed between the two entities. Accordingly, we conclude that the Act does not impose a duty on JP Morgan.

25

**D.** **Whether Common-Law Duty Should Exist**

The subcontractors contend on appeal that this court should impose a new common-law duty on financial institutions that administer construction accounts as JP Morgan did in this case. In deciding whether to impose a new common-law duty, courts must first consider the risk, foreseeability, and likelihood of injury, and then weigh those factors against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant. *See Nabors Drilling, Inc. v. Escoto*, 288 S.W.3d 401, 410 (Tex. 2009). The most important factor to consider is the foreseeability of the risk. *See Texas Home Mgmt. v. Peavy*, 89 S.W.3d 30, 36 (Tex. 2002). The test for foreseeability is what a party should, under the circumstances, reasonably anticipate as a consequence of its conduct. *Foster v. Denton Indep. Sch. Dist.*, 73 S.W.3d 454, 465 (Tex. App.—Fort Worth 2002, no pet.). However, foreseeability alone is not enough to create a duty. *See Golden Spread Council, Inc. No. 562 of Boy Scouts v. Akins*, 926 S.W.2d 287, 290-91 (Tex. 1996).

In addition to the balancing test, courts must also consider (1) whether one party had superior knowledge of the risk; (2) whether one party had a right to control the actor who caused the harm; (3) whether societal changes require recognition of new duties; (4) whether the creation of a new duty would be in conflict with existing statutory law; and (5) whether there are countervailing concerns that would support or hinder the recognition of a new duty. *See Nabors*, 288 S.W.3d at 410; *Thapar v. Zezulka*, 994 S.W.2d 635, 639-40 (Tex. 1999); *Bird v. W.C.W.*, 868 S.W.2d 767, 769 (Tex. 1994); *Graff v. Beard*, 858 S.W.2d 918, 920 (Tex. 1993); *Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 310 (Tex. 1983).

We first address the initial considerations: the risk, foreseeability, and likelihood of injury. Here, the subcontractors' injury was that they were not paid for some of their work on the Chandler Creek Project. Although JP Morgan could have anticipated this injury, it could have done so only in the same way that every party to every construction contract could foresee the possibility that a contractor, for whatever reason, may not pay subcontractors for their work. In fact, the danger of subcontractors remaining unpaid in construction projects is so well known that the Texas legislature recognized and responded to it by enacting the Trust Fund Act, which we have previously discussed in this opinion. *See* Tex. Prop. Code Ann. §§ 162.001-.033. The Act was specifically created for the protection of laborers and materialmen and imposes fiduciary duties on contractors to ensure that Texas subcontractors, mechanics, and materialmen are paid for completed work. *See Exchanger*, 330 F.3d at 345. However, as previously indicated, the Act does not apply to JP Morgan. *See* Tex. Prop. Code Ann. § 162.004(a).

We turn now to the second set of considerations: the social utility of JP Morgan's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on JP Morgan. Regarding the first consideration, we find significant social utility in JP Morgan's general conduct of entering into a contract in which it agreed to lend money to a non-profit organization for the construction of a low-income apartment complex. Regarding the second and third considerations, we find the magnitude of the burden of protecting subcontractors and the consequences of placing that burden on lenders such as JP Morgan significant. Lenders currently do not carry such a burden unless they explicitly agree to do so. Thus, they are currently able to assess their liability at the time of entering into the contract. The more they can limit their liability,

27

the more freely they can lend money for projects such as the one here. If we were to impose a duty on them to withhold retainage and ensure that subcontractors were paid, we would be exposing them to a considerable number of costly lawsuits brought by parties that they may not even be able to identify at the time of entering into the contract. Also, placing the burden on lenders such as JP Morgan would interfere with their freedom to contract as they see fit, which is a strongly favored public policy in Texas. *See Gym-N-I Playgrounds, Inc. v. Snider*, 220 S.W.3d 905, 912 (Tex. 2007) ("Texas strongly favors parties' freedom of contract"). In *Gym-N-I*, the Texas Supreme Court emphasized the importance of the policy, stating:

> Public policy requires . . . that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts when entered into freely and voluntarily shall be held sacred and shall be enforced by Courts of justice. Therefore, you have this paramount public policy to consider—that you are not lightly to interfere with this freedom of contract.

*Id*. (citing *BMG Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 767 (Tex. 2005)) (quoting *Wood Motor Co. v. Nebel*, 238 S.W.2d 181, 185 (Tex. 1951)). JP Morgan and Agape explicitly disavowed the existence of any third-party beneficiaries of the construction agreement other than the bondholder. If we were to impose a duty on JP Morgan with regard to subcontractors, we would void the disavowal in this case and prohibit similar language in future contracts.

We now address the final set of considerations: whether one party had superior knowledge of the risk; whether one party had a right to control the actor who caused the harm; whether societal changes require recognition of new duties; whether the creation of a new duty would be in conflict with existing statutory law; and whether there are countervailing concerns that

would support or hinder the recognition of a new duty. Regarding the first consideration, whether JP Morgan had superior knowledge of the risk, we first note that the risk of harm in this case was allegedly created by the fact that JP Morgan was in control of the construction account but was not under a statutory obligation to withhold retainage in the account. Because the subcontractors did not know that JP Morgan had control over the construction account, we conclude that JP Morgan had superior knowledge of the risk associated with the arrangement between JP Morgan and Agape. With respect to the second consideration, whether the subcontractors had a right to control JP Morgan, there is no evidence in the record that the subcontractors had a right to exert control over JP Morgan.

Although the first two considerations weigh against JP Morgan, the remaining three do not. For instance, there are no societal changes implicated in this case that would require our recognition of a new duty. In addition, the creation of a new duty would be in conflict with existing statutory law. As previously indicated, the Act and section 53.101 of the property code were created to protect subcontractors, but they do not apply to entities such as JP Morgan. Specifically, the Act makes subcontractors the beneficiaries of trust funds in construction accounts but exempts banks from the Act's provisions. *See* Tex. Prop. Code Ann. §§ 162.003-.004. Similarly, section 53.101 of the property code delineates the type of entities required to withhold retainage in construction accounts but does not include entities such as JP Morgan. *See id*. § 53.101. If there is a gap in either of the statutes that the legislature mistakenly failed to fill, it is still the legislature, not the courts, that must correct that mistake. *See Brown v. De La Cruz*, 156 S.W.3d 560, 566 (Tex. 2004). Finally, as a countervailing concern that hinders the recognition of a new duty, we note our reluctance, as an

29

intermediate court of appeals, to recognize a new common-law duty that has no existence in established law. *See Lubbock County v. Trammel's Lubbock Bail Bonds*, 80 S.W.3d 580, 585 (Tex. 2002).

Having considered all the relevant factors, we conclude that the factors weighing against the imposition of a new duty outweigh those in favor. Accordingly, we decline to recognize a new common-law duty under the circumstances of this case.

### E.      Conclusion Regarding Negligence

Because we have determined that JP Morgan did not owe a duty to the subcontractors, and because the existence of a legal duty is an essential element of negligence, we conclude that the trial court erred in finding that JP Morgan was negligent in failing to exercise reasonable care in disbursing retainage funds from the construction account prior to the completion of the project. *See City of Keller*, 168 S.W.3d at 810; *Southwestern Elec.*, 73 S.W.3d at 224 ("In the absence of a duty, there can be no negligence.").

Further, because a defendant cannot be grossly negligent without being negligent, the trial court also erred in concluding that JP Morgan was grossly negligent in disbursing the retainage funds from the construction account. *See Driskill v. Ford Motor Co.*, 269 S.W.3d 199, 206 (Tex. App.—Texarkana 2008, no pet.); *Trevino v. Lightning Laydown, Inc.*, 782 S.W.2d 946, 949 (Tex. App.—Austin 1990, writ denied).

In addition, because we hold that there is no evidence of gross negligence, and because the trial court's award of exemplary damages was based on its finding of gross negligence,

30

we also hold that the trial court erred in awarding exemplary damages. *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.003 (West Supp. 2009).

### *Fiduciary Duty*

In its fourth issue, JP Morgan contends that the trial court erred in concluding that JP Morgan owed a fiduciary duty to the subcontractors. Specifically, JP Morgan argues that it did not owe a fiduciary duty to the subcontractors because a fiduciary duty requires a special relationship between the two parties, and there was no relationship between JP Morgan and the subcontractors. We agree with JP Morgan that the imposition of fiduciary duties requires a special relationship. *See National Plan Adm'rs, Inc. v. National Health Ins. Co.*, 235 S.W.3d 695, 700 (Tex. 2007) ("Fiduciary duties are imposed on parties to certain relationships based on the special nature of the relationships."); *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 199 (Tex. 2002) ("Fiduciary duties are imposed by courts on some relationships because of their special nature.").

The special relationship alleged by the subcontractors is that of a trustee and trust beneficiary. Texas courts have long held that certain fiduciary duties are owed by a trustee to a beneficiary of the trust. *See Johnson*, 73 S.W.3d at 199; *Huie v. DeShazo*, 922 S.W.2d 920, 923 (Tex. 1996). The subcontractors contend that JP Morgan was the trustee of funds in the construction account pursuant to the Act and that the subcontractors were the beneficiaries of the funds. *See* Tex. Prop. Code Ann. § 162.002 (defining "trustee" as contractor, subcontractor, or owner, or officer, director, or agent of contractor, subcontractor, or owner). The subcontractors allege that JP Morgan falls within the Act's definition of "trustee" because JP Morgan acted as Agape's agent in controlling the construction account and deciding whether to withhold retainage. However, we have already

31

determined that there is no evidence to establish an agency relationship between JP Morgan and Agape. Thus, JP Morgan is not a trustee under the Act.

Further, we have also previously concluded that the plain language of the Act exempts banks and other lenders from its requirements. *See id*. § 162.004. Therefore, even if there were evidence of an agency relationship between JP Morgan and Agape, JP Morgan still could not be held liable under the Act. Because there is no relationship between JP Morgan and the subcontractors to which fiduciary duties could attach, the trial court erred in concluding that JP Morgan owed a fiduciary duty to the subcontractors. *See City of Keller*, 168 S.W.3d at 810; *Cain*, 709 S.W.2d at 176.

### *Conversion*

In its fifth issue, JP Morgan asserts that the trial court erred in concluding that JP Morgan converted the retainage funds in the construction account. In order to establish conversion, plaintiffs must prove that: (1) they owned or had legal possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with, the plaintiffs' rights as owners; (3) the plaintiffs demanded return of the property; and (4) the defendant refused to return the property. *Augillard v. Madura*, 257 S.W.3d 494, 500 (Tex. App.—Austin 2008, no pet.). On appeal, JP Morgan disputes only the first element, arguing that the subcontractors did not own, have legal possession of, or have entitlement to possession of, the funds in the construction account.

Specifically, JP Morgan contends that the subcontractors could not have owned any of the funds in the construction account because the funds were at all times owned by and held for the benefit of the bondholder. We agree. The trust indenture between Capital Area and JP Morgan and the construction agreement between JP Morgan and Agape make it clear that the funds in the construction account were the proceeds of tax-exempt bonds owned by the bondholder and that the funds in the account were to be disbursed to Agape only if certain conditions were met. The character of the funds as bond proceeds that were to be held for the benefit of the bondholder is explained in the trust indenture, which states that the bond proceeds were to be held "[i]n Trust Nevertheless, upon the terms and conditions herein set forth for the equal and proportionate benefit, security and protection of all present and future Owners of the Bonds Outstanding . . . ." The trust indenture also provides that "[a]ll moneys from time to time received by the Trustee and held in the Funds and Accounts created hereby (other than the Rebate Fund) shall be held in trust as security for the benefit of the Owners of the Bonds."[9]

The construction agreement between JP Morgan and Agape maintains the same characterization of the funds. Initially, the construction agreement defines the "construction fund" as "[t]he fund, established under the Indenture and containing, among other amounts, the proceeds of the purchase of the Bonds, held and disbursed by the Trustee." The agreement then goes on to explicitly disavow any third-party beneficiaries with the exception of the bondholder, stating that

---

[9] The trust indenture's characterization of the bond proceeds as being held for the benefit of the owners of the bonds is consistent with the text of the Housing Finance Corporations Act, which, as previously indicated, states that a trust indenture "may provide that the remedies and rights to enforcement may be vested in a trustee, with full power of appointment, for the benefit of all the bondholders." *See* Tex. Loc. Gov't Code Ann. § 394.054.

33

"[a]ll conditions to the performance of the obligations of Servicer, Trustee and Bank under this Agreement, including the obligation to authorize Advances, are imposed solely and exclusively for the benefit of the Servicer, Trustee and Bank and the Majority Owner (who shall be a third party beneficiary hereof) . . . ." The agreement defines the 'Majority Owner' as "[t]he entity or entities constituting the "Majority Owner" of the Bonds pursuant to the Indenture." Thus, only the bondholder had third-party beneficiary status under the construction agreement.

The subcontractors respond to JP Morgan's arguments by citing *Security State Bank v. Valley Wide Electric Supply Company*, 752 S.W.2d 661 (Tex. App.—Corpus Christi 1988, writ denied), and contending that "[m]oney can be converted if a bank, with knowledge of its trust character, applies the money to reduce a debt of the bank." However, *Valley Wide* and similar cases are distinguishable from this case. Those cases address only the situation in which a party deposits money into a bank account and the bank uses the money to offset the party's existing debt even though the bank has knowledge of the trust character of the money. *See Mauriceville Nat'l Bank v. Zernial*, 892 S.W.2d 858, 859-60 (Tex. 1995); *Alon USA, LP v. State*, 222 S.W.3d 19, 30-31 (Tex. App.—Austin 2005, pet. denied); *Valley Wide*, 752 S.W.2d at 664. In this case, the subcontractors did not deposit money into the construction account. Rather, the funds in the account were bond proceeds that were under the control of JP Morgan, held for the benefit of the bondholder, and disbursed to Agape only if Agape met certain conditions specified in the construction agreement. Further, the funds were not trust funds that benefitted the subcontractors. They were trust funds only with respect to the relationship between JP Morgan and the bondholder, not with respect to the relationship between JP Morgan and the subcontractors. In addition, JP Morgan did not use the

34

funds to offset the subcontractor's existing debt. The funds of which the subcontractors complain are funds that JP Morgan declined to release to Agape because Agape no longer met the conditions necessary to receive funds as described in the construction agreement. Thus, because *Valley Wide* and similar cases are distinguishable, we find them inapplicable to our analysis.

The subcontractors also argue that they established ownership of some of the remaining funds in the construction account because testimony at trial established that they earned the money based on the services they provided to Agape, and that JP Morgan considered the money as belonging to them. Specifically, as evidence that they rightfully earned the money, the subcontractors point to the following testimony of Robert Bobinchuck, the president of AMHC:

| Counsel: | With respect to the subcontractors, they were paid up to a certain point in time. Isn't that true? |
|---|---|
| Robert Bobinchuck: | That's correct. |
| Counsel: | And the reason that these contractors that have subcontract agreements were not paid was because the funding stopped? |
| Robert Bobinchuck: | The funding stopped, and there were some overruns. It was a combination of those two things. |
| Counsel: | It wasn't because the subcontractors didn't do their work? |
| Robert Bobinchuck: | No, it was not. |
| Counsel: | The subcontractors did their work and did it satisfactorily as far as you are concerned? |
| Robert Bobinchuck: | Yes. |

As evidence that JP Morgan considered some of the money as belonging to the subcontractors, the subcontractors point to the following testimony of Brian Tuerff, senior vice president of JP Morgan, in which Tuerff addressed the money remaining in the construction account at the time that JP Morgan refused to disperse any more funds to Agape:

Counsel: You don't question, you don't dispute that [some of the remaining money] is owed to somebody, be it the subcontractors, do you?

Tuerff: No.

Counsel: And so what you did when you transferred this $864,000, which includes the two eighty-two, is basically transfer at least $282,931 of subcontractors' monies. Isn't that true?

Tuerff: That was — sure.

Counsel: [JP Morgan] hadn't earned it. [JP Morgan] didn't go out there and put up those sticks and stones, did it?

Tuerff: No.

Counsel: And so you're basically transferring monies that belonged to third parties?

Tuerff: It was never transferred. The money was always in the construction loan account.

As further evidence that JP Morgan recognized some of the funds as belonging to the subcontractors, the subcontractors cite to a letter sent from JP Morgan to Agape after Agape defaulted on the loan, in which JP Morgan stated that some of the funds in the account would be used to pay project costs. The relevant provisions state:

Section 7.9 of the Construction Facility Agreement provides, among other things, that the balance of the "developer overhead" line item in the Development Budget, in the amount of $250,000.00, shall not be advanced unless and until the Letter of Credit is returned to [JP Morgan]. This $250,000.00 sum has been reallocated to the contingency reserve and will be disbursed by [JP Morgan] for Project Costs.

Section 7.8 of the Construction Facility Agreement provides, among other things, that the balance of the "developer's fee" line item in the Development Budget, in the amount of $1,050,000.00, shall not be advanced unless and until the Project has achieved Stabilization. Of this amount, the sum of $488,346.00 in the Development Budget has been reallocated to the contingency reserve and will be disbursed by [JP Morgan] for Project Costs.

However, even assuming that the cited passages establish each of the propositions that the subcontractors contend they do—that the subcontractors earned some of the money remaining in the construction funds, that JP Morgan acknowledged that some of the remaining money belonged to the subcontractors, and that JP Morgan agreed to settle the subcontractors' claims out of the construction funds—the subcontractors do not cite to any authority showing how the propositions demonstrate that the subcontractors owned, had possession of, or were entitled to possession of the funds. We have already determined that the trust indenture between Capital Area and JP Morgan and the construction agreement between JP Morgan and Agape show that the funds in the construction account were owned by and held for the benefit of the bondholder alone. Without a legal theory on which to base a determination that any of the statements cited by the subcontractors alter the ownership of the funds, our conclusion that the funds were owned solely by the bondholder remains the same.

Because there is no evidence that the subcontractors owned, had legal possession of, or had entitlement to possession of any of the remaining construction funds, the trial court erred in

37

concluding that JP Morgan converted the retainage funds in the account.[10]  *See City of Keller*, 168 S.W.3d at 810; *Cain*, 709 S.W.2d at 176.

### *Conclusion Regarding Issues Raised by JP Morgan*

Given our determinations that the evidence is legally and factually insufficient to support all of the trial court's findings of fact and conclusions of law challenged by JP Morgan, we also conclude that the trial court erred in holding that the subcontractors were entitled to recover damages and exemplary damages against JP Morgan.

## ISSUES RAISED BY MICHAEL BOBINCHUCK

### *"Trustee" Under Texas Trust Fund Act*

In his first issue, Bobinchuck contends that the trial court erred in finding that he was a "trustee" of the construction funds under the Act.  *See* Tex. Prop. Code Ann. § 162.002.  The trial court awarded damages to both Agape and Gypsum based on its conclusion that Bobinchuck violated the Act.  The Act defines a "trustee" as "[a] contractor, subcontractor, or owner or an officer, director, or agent of a contractor, subcontractor, or owner, who receives trust funds or who

---

[10] In addition to its other issues, JP Morgan also contends that the trial court erred in finding that JP Morgan violated the construction agreement by failing to withhold retainage in the construction account.  To the extent that JP Morgan raises this issue with regard to the claims of the subcontractors, we agree that the trial court erred in this instance because:  (1) we have already held that the subcontractors are not third-party beneficiaries of the construction agreement and thus do not have standing to bring a claim under the agreement; and (2) JP Morgan did not have a duty to withhold retainage under Chapter 53 of the property code because it was not the owner of the project or the owner's agent.  *See* Tex. Prop. Code Ann. § 53.101 (West 2007); *MCI Telecomms. Corp. v. Texas Utils. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999).  To the extent that JP Morgan raises this issue with regard to claims brought by Agape, we need not address the issue because Agape non-suited its cross-claims against JP Morgan, and the two parties agreed to dismiss any claims between them on appeal.

38

has control or direction of trust funds." *Id*. Bobinchuck argues that he was not a trustee because: (1) he was not the owner of the project or an officer of American Multi,[11] and (2) he did not have control or direction of the trust funds.

In response, Agape and Gypsum concede that Bobinchuck was not the owner of the project or an officer or director of American Multi but assert that he nonetheless falls within the statutory definition of "trustee" because (1) he was an agent of American Multi, as evidenced by his authority to sign checks on behalf of the company, and (2) he had direction of the trust funds because he signed several of the checks that were paid out of American Multi's account. We discuss each sub-issue separately below.

## A. Agency Relationship

As previously indicated, a person is an agent if he (1) acts for and on behalf of another entity and (2) is subject to that entity's control. *See Stanford*, 623 S.W.2d at 801. Here, there is more than a scintilla of evidence of both elements. First, regarding whether Bobinchuck acted for and on behalf of American Multi, the record shows that he did so by co-signing checks on behalf of the company. Specifically, the record reveals that Bobinchuck co-signed at least nine checks on

---

[11] Agape and Gypsum contend that Bobinchuck waived the argument that he was not an officer of American Multi because he did not assert the argument in a verified pleading in the trial court after suit was filed. They argue that Bobinchuck's argument is equivalent to an argument that he is not liable in the capacity in which he was sued, and they cite Texas Rule of Civil Procedure 93(2), which requires a defendant who claims not to be liable in the capacity in which he is sued to assert the claim in a verified pleading. *See* Tex. R. Civ. P. 93(2). However, Bobinchuck does not assert that he is not liable in his individual capacity and that he should have been sued in some other capacity. Rather, he argues that Agape's and Gypsum's claims under the Texas Trust Fund Act ("the Act") do not apply to him because he was not a trustee under the Act. Thus, we reject Agape and Gypsum's contention.

behalf of American Multi. Second, regarding whether Bobinchuck was subject to American Multi's control, the record indicates that he was under the control of Mike Parr, the president of American Multi. Bobinchuck testified that all of the checks he signed on behalf of American Multi had already been signed by Parr and that Parr was "always" the person who determined whether, when, and how a person was paid. Robert Bobinchuck also testified that Parr was the person at American Multi who made the decisions about who was paid. In addition, Jeananne Gafford, the person responsible for issuing checks at American Multi, testified that Parr was "somewhat jealous of his territory" and that he "very, very seldom" let anyone intrude upon his decision-making process regarding who was to be paid. Thus, based on Bobinchuck's authority to sign checks on behalf of American Multi and Parr's control over who was paid from American Multi's account, we conclude that there was an agency relationship between Bobinchuck and American Multi.

## B.    Control or Direction of Trust Funds

To be a trustee under the Act, a person must receive trust funds or have control or direction of trust funds. Agape and Gypsum do not provide arguments or citations to the record regarding Bobinchuck's alleged receipt of trust funds or control or direction of trust funds. In our own review of the record, we find nothing to suggest that Bobinchuck received any of the funds in American Multi's account. Thus, we turn to whether there is evidence that he had control or direction of the funds in the account. In that regard, the record shows only that Bobinchuck co-signed some of the checks on behalf of American Multi. However, cases finding sufficient evidence of a person's control or direction of trust funds have required more than signatory authority. *See Nuclear Corp. v. Hale*, 355 F. Supp. 193, 195, 197 (N.D. Tex. 1973), *aff'd*, 479 F.2d 1045 (5th Cir.

40

1973) (court found control or direction of trust funds where defendants were stockholders and officers of company; signed most checks paid out of company account; and possessed and exercised power to direct which creditors were paid); *C & G, Inc.*, 165 S.W.3d at 452, 455 (court found control or direction of trust funds where defendants were principal officers of company, had signatory authority on checking account, and played some part in decision of who was paid); *Lively v. Carpet Servs., Inc.*, 904 S.W.2d 868, 870, 873 (Tex. App.—Houston [1st Dist.] 1995, writ denied) (court found control or direction of trust funds where defendant was sole shareholder, officer, and director of company and had control over funds in company account); *McCoy v. Nelson Utils. Servs.*, 736 S.W.2d 160, 165 (Tex. App.—Tyler 1987, writ ref'd n.r.e.) (court found control or direction of trust funds where defendant was co-owner of company, had control of funds within company, signed checks for company, and directed to whom checks should be paid).

Here, Bobinchuck was not an officer of American Multi, and there is no evidence that he maintained American Multi's account or had any involvement in decisions regarding the funds or who was to be paid from the account. To the contrary, the testimony already referenced in this opinion—that Parr was the president of American Multi, that he signed checks before Bobinchuck did, that he "always" decided who would be paid, and that he "very, very seldom" let anyone intrude upon his payment decisions—suggests that it was Parr, not Bobinchuck, who had control and direction of the funds in American Multi's account.[12] There was no such evidence offered with regard to Bobinchuck. Accordingly, we conclude that the evidence is legally and factually insufficient to establish that Bobinchuck controlled or directed trust funds. *See Nuclear Corp.*,

---

[12] Parr was not named as a defendant in the subcontractors' suit.

41

355 F. Supp. at 195, 197; *C & G, Inc.*, 165 S.W.3d at 452, 455; *Lively*, 904 S.W.2d at 870, 873; *McCoy*, 736 S.W.2d at 165.

**C.     Conclusion Regarding Whether Bobinchuck was a "Trustee"**

Because the evidence was legally and factually insufficient to establish that Bobinchuck controlled or directed trust funds, the trial court erred in finding that he was a trustee under the Act.[13]  *See* Tex. Prop. Code Ann. § 162.002.  By extension, the trial court also erred in finding that Bobinchuck misapplied trust funds under the Act.  *See id*. §§ 162.002, 162.031.  Thus, the trial court further erred in concluding that Agape and Gypsum were entitled to recover damages from Bobinchuck based on their claims under the Act and that Gypsum was entitled to recover exemplary damages from Bobinchuck.[14]

**CONCLUSION**

In light of our conclusions that the evidence is legally and factually insufficient to support each of the trial court's findings and conclusions challenged on appeal, we reverse the portions of the trial court's judgment awarding judgment to Contract Carpet and Gypsum against JP

---

[13] Because we conclude that the claims of Agape and Gypsum under the Act must fail based on our determination that Bobinchuck was not a trustee under the Act, we need not address Bobinchuck's additional arguments as to why he should not be found liable under the Act. *See* Tex. R. App. P. 47.1.

[14] Although the trial court's conclusion of law regarding the award of exemplary damages does not specifically reference Gypsum's claim under the Act, and although the trial court issued conclusions of law regarding other claims—that Bobinchuck breached a fiduciary duty to Gypsum and that Bobinchuck converted funds belonging to Gypsum—the claim under the Act is the only claim raised against Bobinchuck by Gypsum in its petition and throughout trial and thus the only claim under which Gypsum could recover exemplary damages.  The record is unclear as to why the trial court addressed the other claims that were not asserted by Gypsum.

Morgan and the portions awarding judgment to Agape and Gypsum against Michael Bobinchuck. Consequently, we also reverse the portions of the trial court's judgment ordering: (1) JP Morgan to pay $50,051.20 and pre-judgment interest to Contract Carpet; (2) JP Morgan to pay $61,748, pre-judgment interest, and court costs to Gypsum; (3) JP Morgan to pay $30,000 to Contract Carpet as exemplary damages; (4) JP Morgan to pay $30,000 to Gypsum as exemplary damages; (5) Michael Bobinchuck to pay $15,235.37, post-judgment interest, and court costs to Agape; (6) Michael Bobinchuck to pay $15,235.27, pre-judgment interest, and court costs to Gypsum; and (7) Michael Bobinchuck to pay $15,000 to Gypsum in exemplary damages. The remaining portions of the trial court's judgment remain intact.

_____

Diane M. Henson, Justice

Before Chief Justice Law, Justices Puryear and Henson
    Chief Justice Law Not Participating[15]

Reversed and Rendered

Filed: December 11, 2009

---

[15] Because Chief Justice Law was originally assigned to author this opinion, authoring duties were reassigned as of July 2, 2009.