# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON RECONSIDERATION EN BANC

## NO. 03-09-00518-CV

**Black + Vernooy Architects, J. Sinclair Black, and D. Andrew Vernooy, Appellants**

**v.**

**Lou Ann Smith; Jimmy Jackson Smith, Individually and as Next Friend of Rachel and Grayson Smith; and Karen E. Gravely, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT NO. D-1-GN-06-002615, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING

## O P I N I O N

Our opinion and judgment issued on December 8, 2010, are withdrawn, and the following opinion is substituted.

Appellees Lou Ann Smith, Jimmy Jackson Smith, individually and as next friend of Rachel and Grayson Smith, and Karen E. Gravely (collectively, the "Smiths") sued appellants Black + Vernooy Architects, J. Sinclair Black, and D. Andrew Vernooy (collectively, the "Architects") for negligence in connection with injuries suffered by Lou Ann Smith and Karen Gravely when the

second-floor balcony of a friend's home collapsed while they were standing on it.[1]  A jury found that the injuries were partially caused by the negligence of the Architects.  The Architects appeal the jury's determination.  Because the Architects owed no duty to the Smiths as a matter of law, we will reverse the judgment of the district court.

**BACKGROUND**

In October 2000, Robert and Kathy Maxfield hired the Architects to design a vacation home for them.  When the Maxfields hired the Architects, they signed an agreement based on forms promulgated by the American Institute of Architects that are used nationwide.  As directed by the agreement, the Architects designed the Maxfields' residence and prepared the construction drawings and specifications.  The proposed design had a balcony off the master bedroom.

After hiring the Architects, the Maxfields later hired Steve Nash of Nash Builders, Inc. as the general contractor for the project.  When Nash was hired, the Maxfields and Nash entered into a construction contract that was also based on forms promulgated by the Institute and that explicitly incorporated terms from those forms.  Under the contract, Nash was responsible for building the home and was authorized to hire subcontractors to facilitate the construction.  During the construction, Nash hired a subcontractor, Steven Rodriguez, to build the balcony.

When Rodriguez built the balcony, he did not do so in compliance with the design drawings.  The design drawings required that the metal pipes supporting the balcony be welded to steel plate tabs, which would then be bolted to the balcony.  As constructed, however, the metal

---

[1]  Although we will generally refer to the parties by their collective names, we will also refer to them individually when necessary.

support pipes were attached to the balcony using thin metal clips. The design drawings also required that a metal support piece, referred to as a "joist hanger," be used to reinforce the attachment of each of the balcony joists to the exterior wall of the house. In the actual construction of the balcony, however, no joist hangers were used. Although required by the design drawings, the balcony handrail was not bolted to the house. Finally, the design drawings called for the balcony to be attached to the exterior wall of the house by bolting it to a one-and-one-half-inch-thick rim joist and another one-and-one-half inches of wood blocking. Despite these specifications, the balcony was not attached to the house using bolts, a rim joist, and blocking, but was instead nailed to a one-half-inch piece of plywood.

Over a year after the home was completed, Karen Gravely and Lou Ann Smith visited the Maxfields' vacation home. At some point during the visit, Karen and Lou Ann stepped out onto the upstairs balcony. A few seconds later, the balcony separated from the exterior wall of the home and collapsed, causing the two women to fall approximately twenty feet to the ground. Lou Ann was rendered a paraplegic as a result of the injuries that she suffered in the fall, and Karen suffered a broken finger, a crushed toe, and multiple bruises.

Karen and the Smith family sued the Maxfields, Nash, and the Architects for negligence in connection with the collapse of the balcony. Nash and the Maxfields settled prior to trial. Under the terms of the settlement, Nash agreed to pay $1.4 million, and the Maxfields agreed to pay $250,000. Ultimately, a jury trial was held to address the issue of the Architects' liability. A jury found that the injury was caused by the negligence of (1) the Architects who designed the home, (2) the general contractor who built the home, and (3) the framing subcontractor who installed

the balcony. The jury attributed 10% of the responsibility to the Architects, 70% to Nash (the general contractor), and 20% to Rodriguez (the subcontractor). Based on the jury's findings related to damages and proportionate responsibility, as well as adjustments for medical expenses actually paid, the district court rendered judgment that the Smith family recover a total of $380,749.19 from the Architects, plus prejudgment interest, and that Karen recover nothing from the Architects.[2]

The Architects appeal the judgment of the district court.

## PRELIMINARY STATEMENT

Before addressing the issues raised on appeal, we feel it is necessary to provide a little background regarding what we are charged with deciding in this case and what decisions we are not faced with. Unquestionably, Karen and Lou Ann were injured, Lou Ann suffering what can only be described as catastrophic injuries, as a result of their innocent decision to stand on a balcony that they reasonably and justifiably believed was properly built. It wasn't. And Lou Ann's life and the lives of her family members have been irrevocably damaged as a result.

In this case, we are not being asked to make any decisions regarding whether the Smiths were entitled to recover from the homeowners, nor have we been asked to determine whether the Smiths may recover from the general contractor and subcontractor whose abysmal building

---

[2] The district court did not consider the settlement amounts received from Nash and the Maxfields when calculating the amounts owed to the Smiths because the Architects' proportionate share of the damages was smaller than the total damages award minus the total settlement amount. *Compare* Tex. Civ. Prac. & Rem. Code Ann. § 33.012(b) (West 2008) (specifying that amount of damages must be reduced by dollar amounts of all settlements), *with id.* § 33.013 (West 2008) (explaining that defendant is liable only for percentage of damages equal to that defendant's proportionate responsibility, provided responsibility does not exceed 50%).

practices led to this terrible tragedy. Furthermore, we stress that in this appeal there has been no allegation that the Architects negligently designed the balcony or that the Architects actually created the defects at issue. To the contrary, the Smiths allege that the defect was caused by the construction practices of the contractor and subcontractor when the balcony was not built in accordance with the design plans of the Architects. Similarly, the jury was not asked to determine whether the Architects were liable under a negligent-undertaking theory.[3] Finally, and perhaps most importantly, we have not been asked to make any determination regarding any duty that the Architects owed to the owners of the home (the Maxfields) or the extent of that duty; instead, we have only been asked to decide whether the contractual duty that the Architects owed to the homeowners also extended to the Smiths.

Unquestionably, the Architects entered into a contractual agreement in which they agreed to make periodic visits to the construction site, to report observed deviations from the design plans to the Maxfields, and to guard the Maxfields against defects in the construction of the home; however, the Smiths and the dissent ask us to do something that has never been done in the history of Texas jurisprudence: they request this Court to transform and extend the contractual duty owed

---

[3] The jury charge did not submit a negligent-undertaking theory through an instruction regarding whether the Architects knew that they were performing services that were necessary for the Smiths' protection and whether the Smiths relied on the Architects' performance. *See Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837-39 (Tex. 2000) (listing elements of negligent-undertaking claim and concluding that appellants could not have been held liable for negligent undertaking because jury charge omitted elements of that claim); *see also* Restatement (Second) of Torts § 323 (1965) (stating that one who undertakes to render services for another "which he should recognize as necessary for the protection of the other's person or things" is liable to "the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if" failure increases risk of harm or harm is suffered because of other's reliance on undertaking).

to the Maxfields into a common law duty owed to the Smiths as visitors to the Maxfields' home. Although our sympathies extend to the Smiths for the suffering they have unjustly been forced to endure, this Court simply cannot create a new common law duty in order to uphold the relief that they sought against the Architects.

Generally speaking, one has no duty to protect an individual from a third party in the absence of a special relationship between the potential actor and the individual or in the absence of a relationship that imposes a duty on the potential actor to control the third party's behavior. *See* Restatement (Second) of Torts §§ 314, 315 (1965). Neither of those circumstances are present in this case. Seemingly acknowledging that the law does not impose a duty on architects to protect house guests of their clients, the Smiths and the dissent suggest that this Court create a common law duty where none has existed before. The creation of a new common-law duty is a task better suited for the supreme court, not intermediate appellate courts, *J.P. Morgan Chase Bank v. Texas Contract Carpet, Inc.*, 302 S.W.3d 515, 535 (Tex. App.—Austin 2009, no pet.) (stating that intermediate appellate courts should be reluctant "to recognize a new common-law duty that has no existence in established law" (citing *Lubbock County v. Trammel's Lubbock Bail Bonds*, 80 S.W.3d 580, 585 (Tex. 2002))), and no Texas case has suggested that an architect could be liable to a third party in the circumstances present in this case.

Although we ultimately conclude that the Smiths are not entitled to recover against the Architects because the Architects owed no duty of care to the Smiths, the perceived harshness of that conclusion should be tempered with the knowledge that the Smiths and others similarly situated may recover from those who actually owed them a duty. In fact, as mentioned above, the

Smiths sought and obtained recovery from the homeowners and the general contractor. Although the dissent may voice its disagreement with the existing boundaries of the law, it is the very nature of law to impose limits to both conduct as well as recovery. Moreover, we cannot embrace the dissent's prophesy that the result we reach in this case will allow architects to "turn a blind eye to open and obvious structural defects and escape liability"; nor can we endorse the dissent's assertion that balconies will be falling from the sky with absolute impunity. As the earlier settlement demonstrates, there are legal consequences for those who negligently build balconies. Further, although architects entering the type of agreement at issue in this case may not owe a duty to the house guests of their clients, they do owe a duty to their clients to endeavor to guard against defects and will be liable to their clients if they fail to comply with that duty.

## DISCUSSION

As mentioned above, the jury found that the Architects were negligent and that their negligence proximately caused the Smiths' injuries. Although the Architects characterize their assertions as a single issue on appeal, they raise several related challenges to the jury's determination. First, they assert that they did not owe a duty to third parties such as the Smiths to identify the balcony defects. Second, they contend that the agreement that they entered into with the Maxfields did not impose on them the obligation to ensure or guarantee that the home was built in compliance with their drawings and specifications. Finally, the Architects argue that even if they owed a duty to the Smiths, the evidence presented during trial was legally insufficient to support a determination that they had, in fact, breached that duty. The Smiths, on the other hand, assert that the jury's determination should be upheld because the Architects owed them a duty to identify the

7

defects and because legally sufficient evidence was presented during the trial showing that the Architects breached that duty. Because we ultimately conclude that any potential duty to identify defects would not have extended to the Smiths, we need not address the Architects' second or third subissues.

To prevail on a claim of negligence, a plaintiff must provide proof of the following three elements: "(1) a legal duty owed by one person to another; (2) a breach of that duty; and (3) damages proximately resulting from the breach." *Dukes v. Philip Johnson/Alan Ritchie Architects, P.C.*, 252 S.W.3d 586, 591 (Tex. App.—Fort Worth 2008, pet. denied); *see Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990). In order to satisfy the duty element, the "plaintiff must establish both the existence and the violation of a duty owed to the plaintiff by the defendant." *Phillips*, 801 S.W.2d at 525. If the defendant has no duty, then he cannot be held liable for negligence. *Morgan Chase*, 302 S.W.3d at 530. In general, an individual has "no duty to take action to prevent harm to others absent special relationships or circumstances." *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 838 (Tex. 2000). A duty may be "assumed by contract or imposed by law." *Morgan Chase*, 302 S.W.3d at 530. The existence of a duty "is a question of law for the courts to decide from the facts surrounding the occurrence in question." *Phillips*, 801 S.W.2d at 525. Accordingly, appellate courts review de novo a determination regarding whether a legal duty is owed. *See Block v. Mora*, 314 S.W.3d 440, 444-45 (Tex. App.—Amarillo 2009, pet. dism'd).

**No Duty was Assumed by Contract**

In asserting that the district court's judgment should be upheld, the Smiths argue that the Architects had a duty to act as reasonable and prudent architects. Further, they assert that the Architects' duty in this case included the obligation to protect the Maxfields (the owners of the home) by observing the construction of the home to determine if the home was being built in compliance with the design plans and by reporting any observable deviations from the construction plans to the Maxfields. As an extension of this duty, the Smiths also assert that the Architects owed them a duty as third-party beneficiaries to the agreement between the Maxfields and the Architects.

As support for these assertions, the Smiths refer to the language of the standard-form contract that the Maxfields and the Architects entered into. The only parties to that agreement were the Architects and the Maxfields. Under the agreement, in addition to seeking design services, the Maxfields also paid the Architects for "contract administration services" during the construction of the residence. With respect to the provision of these services, the contract required the Architects to visit the work site, to inform the Maxfields regarding the progress of the construction, to generally determine if the construction was being performed in the manner agreed to, to report "known deviations from the Contract Documents and from the most recent construction schedule submitted by the Contractor," and "to endeavor to guard the [Maxfields] against defects and deficiencies in the Work." In fact, the agreement authorized the Architects "to reject Work that does not conform to the Contract Documents" and to inspect or test "the Work."[4]

---

[4] The language of the relevant provisions of the contract provides as follows:

**2.6.5** The Architect, as a representative of the Owner, shall visit the site at intervals

9

Furthermore, the Smiths refer to testimony by the Architects and Mrs. Maxfield[5]

appropriate to the state of the Contractor's operations, or as otherwise agreed by the Owner and the Architect in Article 12, (1) to become generally familiar with and to keep the Owner informed about the progress and quality of the portion of the Work completed, (2) to endeavor to guard the Owner against defects and deficiencies in the Work, and (3) to determine in general if the Work is being performed in a manner indicating that the Work, when fully completed, will be in accordance with the Contract Documents. However, the Architect shall not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work. The Architect shall neither have control over or charge of, nor be responsible for, the construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, since these are solely the Contractor's rights and responsibilities under the Contract Documents.

2.6.6 The Architect shall report to the Owner known deviations from the Contract Documents and from the most recent construction schedule submitted by the Contractor. However, the Architect shall not be responsible for the Contractor's failure to perform the Work in accordance with the requirements of the Contract Documents. The Architect shall be responsible for the Architect's negligent acts or omissions, but shall not have control over or charge of and shall not be responsible for acts or omissions of the Contractor, Subcontractors, or their agents or employees, or of any other persons or entities performing portions of the Work.

. . . .

2.6.10 The Architect shall have authority to reject Work that does not conform to the Contract Documents. Whenever the Architect considers it necessary or advisable, the Architect shall have authority to require inspection or testing of the Work in accordance with the provisions of the Contract Documents, whether or not such Work is fabricated, installed or completed. However, neither this authority of the Architect nor a decision made in good faith either to exercise or not to exercise such authority shall give rise to a duty or responsibility of the Architect to the Contractor, Subcontractors, material and equipment suppliers, their agents or employees or other persons or entities performing portions of the Work.

[5] Robert Maxfield did not testify at trial. In their appellate briefs, the Smiths also refer to deposition testimony from both of the Maxfields that they attached as an exhibit to their briefs; however, those depositions are not part of the appellate record. *See* Tex. R. App. P. 34.1 (setting out contents of appellate record); *see also Carlisle v. Philip Morris, Inc.*, 805 S.W.2d 498, 501 (Tex. App.—Austin 1991, writ denied) (explaining that materials outside record that are improperly

10

regarding the contract and the obligations imposed. In particular the Smiths point to testimony by Black indicating that he had a duty to the Maxfields to report any problems with the construction that he observed[6] and to testimony by Mrs. Maxfield stating that part of the reason that she hired Black was because he had supervised the construction of her friend's home "very conscientiously," explaining that it was her understanding that the Architects were obligated under the agreement to regularly visit the construction site and to inform her and her husband regarding any aesthetic or structural issues, and describing that it was her expectation that "there would be supervision that the house was being built."

In light of the preceding, particularly the Architects' obligation to "endeavor to guard . . . against defects and deficiencies" and to generally determine if construction of the home is being done in accordance with the construction plans, the Smiths assert that the Architects owed the Maxfields the duty to protect them from variances in the design plans. Moreover, they insist that although they have no contractual relationship with the Architects, the Architects' duty also extended to them as third-party beneficiaries to the agreement.

An individual is a third-party beneficiary to a contract only if the contracting parties intended to secure a benefit to the third party and also "entered into the contract directly for the third party's benefit." *Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex. 2002). If the benefit is merely

---

attached to party's brief may not be considered on appeal).

[6] During the trial, Black also testified that he considered contract administration services to include making periodic site visits to observe the progress of the work, endeavoring to protect the owner against defects and deficiencies, trying to make sure the home is generally built in compliance with construction documents, and checking shop drawings against the design intent. Black further testified that in performing contract administration for the Maxfields, the Architects averaged two visits to the construction site per month.

incidental, the third party has no right to recover. *Id.*; *see also Loyd v. ECO Res., Inc.*, 956 S.W.2d 110, 134 (Tex. App.—Houston [14th Dist.] 1997, no pet.) (explaining that "fact that a person is directly affected by the parties' conduct . . . does not make him a third party beneficiary"). Moreover, the contract "must clearly and fully express an intent to confer a direct benefit to the third party"; in other words, a third-party-beneficiary status may not be created by implication. *Stine*, 80 S.W.3d at 589. There is a presumption against third-party-beneficiary agreements, and accordingly, all doubts must be resolved against a finding that an individual is a third-party beneficiary. *Raymond v. Rahme & Williams Invs.*, 78 S.W.3d 552, 561 (Tex. App.—Austin 2002, no pet.). The intent of the contracting parties must be determined by examining the entire contract, and courts should give effect to all of the contract's provisions. *Stine*, 80 S.W.3d at 589.

Although the Smiths correctly point out that the contract imposed a duty on the Architects "to endeavor to guard against" defects and deficiencies in the construction of the home and to generally ascertain whether the home was being built in compliance with the construction plans, those responsibilities were contracted for the benefit of the Maxfields. Nothing in the language of the contract demonstrates that these duties were to be engaged in for the benefit of third parties. On the contrary, the agreement specifically stated that "[n]othing contained in this Agreement shall create a contractual relationship with or a cause of action in favor of a third party against either the [Maxfields] or [the] Architect[s]." *Cf. Dukes*, 252 S.W.3d at 594 (explaining that architect's "duty depends on the particular agreement entered into with his employer").

In light of the preceding, particularly the clear language expressly disavowing third-party beneficiaries, we must conclude that when the Architects entered into the agreement with the

Maxfields, they assumed no contractual duty to third-parties to the agreement, including the Smiths. *See MCI Telecomms. Corp. v. Texas Utils. Elec. Co.*, 995 S.W.2d 647, 651-52 (Tex. 1999); *Morgan Chase*, 302 S.W.3d at 531.

**No Duty was Imposed Under Common Law**

In addition to their assertion that the Architects owed them a duty under the contract, the Smiths also contend that the Architects owed them a duty under common law. Although no cases have imposed a duty under the circumstances present in this appeal, the Smiths nevertheless seek the creation of a duty not previously recognized under Texas law. When making this assertion, the Smiths note that a determination regarding the existence of a duty depends on "several interrelated factors," including the foreseeability and likelihood of injury. *See Phillips*, 801 S.W.2d at 525 (listing factors for courts to consider when determining whether defendant owed duty to plaintiff). Further, the Smiths insist that those factors are satisfied in this case because "the for[e]seeability and likelihood of injury from a failure of a balcony hanging over twenty feet above a stone structure is apparent and well-known to all liable parties." In other words, the Smiths urge that the Architects' owed a legal duty extending to them as house guests because they were "foreseeable users." In addition, the Smiths assert that due to the dangers resulting from faulty construction and due to the public's reliance on architects, "public policy demands that contractual privity not be an indispens[a]ble requirement for a duty of care to houseguests, or other for[e]seeable users of the balcony." *See Hermann Hosp. v. National Standard Ins. Co.*, 776 S.W.2d 249, 252-53 (Tex. App.—Houston [1st Dist.] 1989, writ denied) (explaining that although contractual

13

relationship "assures a sufficiently close nexus between the parties upon which [courts] may fairly predicate liability, it is not . . . indispensable to the imposition of a legal duty of care").

Arguably the foreseeability and likelihood-of-injury factors could be viewed as weighing in favor of extending an architect's duty of care. If an architect fails to identify and report a structural defect, a risk of harm can exist. Likewise, when the defect implicates critical safety or structural integrity concerns, one would suspect an increased likelihood of physical injury. It is also foreseeable that the risk of physical injury includes harm to third-party visitors, as it would seem to be a rare case where no person would use a structure other than the owner with whom an architect contracts.

However, foreseeability and likelihood of injury are not the only factors to consider when deciding whether a duty exists. Rather, the risk, foreseeability, and likelihood of injury are to be weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing that burden on the actor. *Bird v. W.C.W.*, 868 S.W.2d 767, 769 (Tex. 1994). In addition, a court may consider whether one party has superior knowledge of the risk, whether one party has a right to control the actor who caused the harm, *Graff v. Beard*, 858 S.W.2d 918, 920 (Tex. 1993), and whether legislative enactments evidence the adoption of a particular public policy significant to the recognition of a new common-law duty, *Thapar v. Zezulka*, 994 S.W.2d 635, 639-40 (Tex. 1999).

The "right to control" consideration weighs against extending an architect's duty to third parties in this case. *See Loyd*, 956 S.W.2d at 130 (explaining that right to control is "often the deciding factor" when determining existence of legal duty). In the "absence of a relationship

14

between the parties giving rise to the right of control, one person is under no legal duty to control the conduct of another, even if there exists the practical ability to do so." *Graff*, 858 S.W.2d at 920; *compare Van Horn v. Chambers*, 970 S.W.2d 542, 546-47 (Tex. 1998) (finding no inherent right to control in physician-patient relationship that would impose duty on physician to protect third parties from patient), *with Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309-11 (Tex. 1983) (explaining that if employer exercises control over employee because employee has become incapacitated, employer has duty to prevent employee from causing unreasonable risk to others). The right to control can arise both by contract and by actual exercise of control. *See Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 783-84 (Tex. 2001) (concluding that more than scintilla of evidence existed showing that general contractor retained control over safety features and approved use of faulty safety device). One's duty of care with respect to another party's work "is commensurate with" the control he retains over that work. *See id.*

The agreement between the Architects and the Maxfields specified that although the Architects had the ability to reject the work done by Nash, they had no power to control the actual construction work performed at the site. *See Shepherd Components, Inc. v. Brice Petrides-Donohue & Assocs.*, 473 N.W.2d 612, 616 (Iowa 1991) (concluding that engineer did not owe duty of care to others because engineer had no right to control work performed and only had "responsibility for quality control"); *see also Coastal Marine Serv. of Tex., Inc. v. Lawrence*, 988 S.W.2d 223, 226 (Tex. 1999) (explaining that "right to control must be more than a general right to order work to stop and start, or to inspect progress"). Specifically, the agreement provided that the Architects "shall neither have control over or charge of, nor be responsible for, the construction means, methods,

15

techniques, sequences or procedures, or for safety precautions and programs in connection with the Work." Instead, the agreement explained that those obligations "are solely the Contractor's [Nash's] rights and responsibilities." Further, the agreement specified that the Architects were responsible for their own acts or omissions but that they "shall not have control over or charge of and shall not be responsible for acts or omissions of the Contractor, Subcontractors, or their agents or employees, or of any other persons or entities performing portions of the Work." Similarly, the agreement stated that the Architects were not "responsible for the Contractor's failure to perform the Work in accordance with the requirements of the Contract Documents." In addition, the agreement explained that neither the authority bestowed on the Architects by the agreement "nor a decision made in good faith either to exercise or not to exercise such authority shall give rise to a duty or responsibility of the Architect[s] to the Contractor, Subcontractors, . . . their agents or employees or other persons or entities performing portions of the Work."

Although not confronted with identical contractual language, a court of appeals analyzing a similar contractual agreement determined that no right to control was authorized by the agreement. *See Romero v. Parkhill, Smith & Cooper, Inc.*, 881 S.W.2d 522, 526 (Tex. App.—El Paso 1994, writ denied). In *Romero*, an engineer entered into an agreement with a city to provide engineering services for the construction of a plant. *Id.* at 524. Under the agreement, the engineer agreed to make periodic visits to the construction site to "observe the progress of the executed work and to determine in general if such work meets the . . . requirements of the contract documents" and to inspect the construction and determine if it has been completed in accordance with the contract documents. *Id.* at 525-26. However, the agreement also specified that the engineer

16

was not obligated to "make exhaustive or continuous on-site inspections to check the quality or quantity of the work"; was not "responsible for the construction means, methods, techniques, sequences or procedures"; and was not "responsible for the acts or omissions of the contractor [or] any subcontractor." *Id.* Ultimately, the court determined that nothing in the contract between the city and the engineer gave the engineer the right to control the construction and, accordingly, that the engineer did not have a duty of care to an employee of a subcontractor to keep the premises safe.[7]

*Id.* at 524, 527.

In contrast to the agreement between the Architects and the Maxfields, the construction contract between the Maxfields and Nash gave Nash the absolute right to control the worksite and the means of construction and also imposed on Nash significant supervisory responsibilities and liability.[8] *See Hobson v. Waggoner Eng'g, Inc.*, 878 So. 2d 68, 76 (Miss. Ct.

---

[7]     Other jurisdictions that have addressed this type of contract have reached similar conclusions. *See Hobson v. Waggoner Eng'g, Inc.*, 878 So. 2d 68, 73-76 (Miss. Ct. App. 2003) (concluding that engineer owed no duty to warn or protect general contractors or subcontractors); *Shepherd Components, Inc. v. Brice Petrides-Donohue & Assocs.*, 473 N.W.2d 612, 615-17 (Iowa 1991) (deciding that engineer did not owe duty of care to others and, therefore, could not be liable for negligence of general contractor regarding safety procedures used on construction site); *Yow v. Hussey, Gay, Bell & DeYoung Int'l*, 412 S.E.2d 565, 567-68 (Ga. 1991) (determining that engineer owed no duty to person who was not involved in construction project but was injured when he entered construction site); *Welch v. Grant Dev. Co.*, 466 N.Y.S.2d 112, 114-16 (N.Y. Sup. Ct. 1983) (affirming summary judgment against worker injured on construction site because contract stripped architect of supervisory powers and placed all supervisory responsibility in hands of contractor); *Gordon v. Holt*, 412 N.Y.S.2d 534, 536-37 (N.Y. App. Div. 1979) (concluding that architect who had duty to periodically inspect construction and report to owner of property did not have duty to future owners and tenants); *Luterbach v. Mochon, Schutte, Hackworthy, Juerisson, Inc.*, 267 N.W.2d 13, 15-16 (Wis. 1978) (affirming summary judgment against carpenter hired by general contractor because contract did not require architect to insure safety of construction site).

[8]     The agreement signed by the Maxfields and by Nash directly incorporated rights and responsibilities outlined in "the 1997 edition of the General Conditions of the Contract for Construction, AIA Document A201-1997."

17

App. 2003) (concluding that engineer had no duty to warn, in part, because general contractor had "full and absolute control over the work site and the means and methods of construction"). Specifically, the agreement stated that Nash "shall not be relieved of obligations to perform the Work in accordance with the Contract Documents either by activities or duties of the Architect[s] . . . or by tests, inspections or approvals required or performed by persons other than the Contractor." Moreover, the agreement also explained that Nash "shall supervise and direct the work[;] . . . . shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work[;] . . . . shall be responsible to the [Maxfields] for acts and omissions of [Nash's] employees [and] Subcontractors[;]" and "shall be responsible for inspection of portions of Work already performed to determine that such portions are in proper condition." In addition, the agreement provided that Nash "warrants to the [Maxfields] and [the] Architect[s] . . . that the Work will be free from defects not inherent in the quality required or permitted, and that the Work will conform to the requirements of the Contract Documents." Finally, the agreement explained that the "Contractor shall indemnify and hold harmless the [Maxfields and the] Architect[s] . . . from and against claims, damages, losses and expenses . . . to the extent" that the claims, damages, or losses were "caused by the negligent acts or omissions of [Nash or] a Subcontractor."[9]

---

[9] Even though the agreement empowered Nash to hire subcontractors to perform construction projects, it also allowed either the Maxfields or the Architects to object to Nash's choices. However, the Architects did not have the authority to supervise the subcontractors. *See Hobson*, 878 So. 2d at 76 (noting, when determining that engineer owed no duty to workers at construction site, that engineer did not have authority to supervise subcontractors).

18

Moreover, nothing in the record establishes that the Architects exercised actual control over the construction of the balcony. *See Lee Lewis Constr.*, 70 S.W.3d at 783 (explaining that although determining what contract says is generally question of law, "determining whether someone exercised actual control is [] generally a question of fact for the jury"). Although the testimony of various witnesses demonstrates that the Architects performed the functions outlined in the contract, none of the testimony or evidence presented indicates that the Architects exerted the type of control over the manner and method of the construction of the balcony as to warrant the imposition of the duty suggested by the Smiths.[10] *See City of Keller v. Wilson*, 168 S.W.3d 802, 810

---

[10] When asserting that the Architects owed them a duty, the Smiths refer to actions taken by the Architects that they allege exceeded the Architects' duties under their agreement with the Maxfields. The agreement required the Architects to "review and certify the amounts due [to Nash] and [to] issue certificates in such amounts." As proof that the Architects exceeded the scope of the agreement, the Smiths point to the language in some of the certificates that stated that the Architects had "inspected" the construction. Those certificates were prepared by Nash and provided, in relevant part, as follows:

> Architect's signature below is his assurance to Owner, concerning the payment herein applied for, that (1) Architect has inspected the Work represented by this Application, (2) such Work has been completed to the extent indicated in this Application, and the quality of workmanship and materials conforms with the Contract Documents . . . .

In light of these certificates for payment, the Smiths contend that the Architects had agreed to ensure "that the construction was progressing according to the construction documents."

Even assuming that the Architects' review of the payment applications did impose some additional obligation on them, that obligation would have extended to the Maxfields for whom the Architects agreed to perform that task. In fact, the certificates relied on by the Smiths and the agreement between the Architects and the Maxfields specified that the Architects' certifications for payment were assurances and representations to the Maxfields. Moreover, the imposition of an obligation to inspect is inconsistent with the terms of the agreement, which clarified that the "issuance of a Certificate for Payment shall not be a representation that the Architect[s] ha[ve] (1) made exhaustive or continuous on-site inspections to check the quality or quantity of the Work [or] (2) reviewed construction means, methods, techniques, sequences or procedures." In addition, as

(Tex. 2005) (explaining that courts sustain legal-sufficiency challenges when record reveals complete absence of evidence of vital fact, that evidence offered to prove vital fact is no more than mere scintilla, or that evidence conclusively establishes opposite of vital fact).

Regarding the social utility of the Architects' conduct, under the agreement between the Architects and the Maxfields, the Architects agreed to report all known deviations from the design. In addition, the contract gave the Architects the authority to require inspection of the structure. There is significant social utility in having the architect responsible for designing a structure also agree to provide some oversight regarding whether the structure is being built in accordance with the design. In general, homeowners will not have the requisite knowledge or training to be able to ascertain whether the construction is progressing properly or to provide a check to potential builder incompetence, and any involvement by an architect during the construction will provide some potential check and will also encourage adherence to the design. Moreover, if an

---

we previously mentioned, this case does not involve a negligent-undertaking claim, but we do note that nothing in the record indicates that the Smiths ever reviewed these certificates or relied on them in any manner. *See Stutzman*, 46 S.W.3d at 837-39 (listing elements of negligent undertaking).

Furthermore, when discussing these certificates, Black testified that the language of those certificates did not comply with the language of the agreement and that the Architects only agreed to use them so that Nash could retain them for his records. Black further clarified that he did not inspect the work as part of the payment certifications and explained that the Architects prepared their own certificates that they sent to the Maxfields along with Nash's certificate and that the parallel forms were consistent with the language of the agreement. The parallel forms provided as follows:

> In accordance with the Contract Documents, based on on-site observations and the data comprising the above-referenced Application for Payment, the Architect certifies to the Owner that to the best of Architect's knowledge, information, and belief, the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the Amount Certified, including overage as described in documents provided by the Contractor.

architect is able to identify deviations from the design plans early in the construction process, the architect will be able to minimize the cost of corrective construction and limit the need for expensive rehabilitative modifications occurring after the home has been constructed.

Indeed, the record reveals several instances in which the Architects' services were beneficial because they were able to identify multiple deviations from the design early on in the construction process and were able to provide advice regarding ameliorative actions that could be undertaken to prevent the need for more costly repairs later. For example, during one of their earlier visits to the site, the Architects notified Nash that the "framer had framed a wall too high," and the wall was lowered to comply with the design drawings. In addition, the Architects also asked Nash to place caps on the ends of the metal pipes used in the structure in order to avoid problems with insects building nests in the pipes. Further, a field report prepared by the Architects revealed deviations from the plan that they identified regarding the kitchen bay window and regarding the placement of lights and electrical outlets.

The magnitude of the burden urged by the Smiths would also be significant. It is noteworthy in this case that the Architects did not notice the defects at issue. During trial, Black testified that when he reviewed various photographs of the construction work to determine if the balcony was built "[i]n compliance with the design intent," he did not notice the defects or deviations from the design drawings.[11] In other words, this is not a case in which an architect noticed a defect but failed to report the defect despite having a duty to report known deviations. Furthermore, under the agreement, the Architects were only obligated to make periodic visits to the site. For this reason,

---

[11] Although Black explained that he did not have a duty to spot defects, he testified that he believed that if he discovered something, he had an absolute duty to report it to the contractor.

the Architects might not have even had an opportunity to observe a particular project before it was completed. Moreover, as described above, Nash had control over the manner and means of construction and, accordingly, over the way in which a particular item was constructed. Accordingly, the absence of any particular piece of construction during a particular visit would not necessarily indicate that the piece would not be added later. Regardless of the limited nature of the Architects' responsibilities under the agreement, the Smiths essentially seek to impose the burden of identifying every defect.

The consequences of placing such a burden on architects would likewise be significant. Under the terms of the agreement, the Architects did not agree to be guarantors or insurers of the work of the general contractor. However, this is the practical consequence of the duty sought by the Smiths. The duty sought by the Smiths would expose the Architects to lawsuits brought by parties that the Architects could not have identified at the time of entering into the contract. To protect against liability, the Architects would have needed to effectively take on the duty of care of a guarantor so as to ensure that all critical matters were fully observed.

Holding the Architects liable would also have the consequence of curtailing the freedom of homeowners and architects to establish by contract the nature and scope of an architect's services, *see Morgan Chase*, 302 S.W.3d at 534 (explaining that freedom of contract is strongly favored public policy); *Dukes*, 252 S.W.3d at 594-95 (explaining that scope of architect's duty depends on particular agreement he entered into with his employer), and would be inconsistent with the limited role for the Architects established by the agreement. Although the agreement required the Architects to monitor the construction and to "endeavor to guard" against defects, the agreement in this case expressly limited those obligations. For example, the agreement clarified that the

22

Architects were not "required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work" and were only required to report "known deviations." Finally, as mentioned earlier, the agreement also specified that "[n]othing contained in this Agreement shall create a contractual relationship with or a cause of action in favor of a third party against either the [Maxfields] or [the] Architect[s]."

Had the Maxfields wanted the Architects to be guarantors or insurers, they could have contracted for such services and would likely have had to pay a higher fee. Instead, the Maxfields contracted for an intermediate level of services—obtaining from the Architects some oversight but not a guarantee. Under this type of agreement, the owner obtains an architect's assistance without having to pay for a full guarantee, and the architect provides assistance without having to incur the type of liability involved with providing a guarantee. Imposing the type of duty suggested by the Smiths onto architects under the type of industry-standard agreement at issue in this case would reduce the likelihood that architects would agree to enter into such agreements in the future or, at the very least, increase the compensation required for the architects' services, despite the significant social utility of such agreements. *See Luterbach v. Mochon, Schutte, Hackworthy, Juerisson, Inc.*, 267 N.W.2d 13, 16 (Wis. 1978) (noting that holding architect liable would render him safety supervisor, which would require continuous presence even though contract only required periodic visits).

Regarding whether the Architects had superior knowledge, there is no allegation that the Architects' design was not sufficiently communicated to the general contractor or to the subcontractor who constructed the balcony. Thus, while the Architects may have had superior knowledge regarding why the balcony required certain methods of construction, nothing in the record

23

indicates that the Architects' knowledge regarding what methods were actually required in accordance with the design—i.e., the metal support pipes and steel plate tabs, the joist hanger, and the bolts, rim joist, and wood blocking—was superior to that of Nash (the party with the right to control the balcony's construction) or Rodriguez (the party who constructed the balcony). More importantly, given that Nash and Rodriguez were charged with the actual construction of the balcony, it cannot be disputed that they had superior knowledge of whether their actions conformed to the design plans.[12] Likewise, the Architects' knowledge of the importance of properly attaching a second-floor balcony would not be superior to that of any other party involved in the balcony's construction.[13]

---

[12] During his testimony, Black admitted that he and another architect knew the design plans better than anyone else. However, the Smiths' expert witness, John Pierce, also conceded that the individuals who built the balcony were more familiar with the actual balcony and how it was constructed than anyone. In fact, he testified that the subcontractor had to know that the balcony had not been constructed in compliance with the design plans and that key components had been left out.

[13] After analyzing whether the Architects or the subcontractor and contractor had superior knowledge, the dissent then considers whether the Architects' knowledge of the construction of the balcony was superior to that of the Smiths. Unquestionably it was. And there has been no allegation in this case that the type of threat posed by the poorly constructed balcony is "within the ordinary knowledge common to the community." *See Joseph E. Seagram & Sons, Inc. v. McGuire*, 814 S.W.2d 385, 388 (Tex. 1991) (refusing to recognize legal duty of alcohol manufacturer to warn consumers against danger of alcoholism because risk is common knowledge). Accordingly, the dissent's comparison of the knowledge possessed by the Architects and by the Smiths seems misplaced. In this case, we are charged with ascertaining whether the Architects' alleged actions and inactions were sufficient to impose a duty of care. In making that determination in this case, the knowledge element is used to ascertain which of the parties involved in the construction of the balcony had greater knowledge of the negligent manner in which the balcony was built. *See Graff v. Beard*, 858 S.W.2d 918, 921-22 (Tex. 1993) (determining that social hosts who make alcohol available to their guests do not owe common law duty to third parties who may be injured if guest becomes intoxicated and drives home; in reaching result, court compared whether host of party or guest is in better position to know guest's level of intoxication). For the reasons discussed above, we do not believe that the Architects possessed the superior knowledge.

24

Finally, there have been no legislative enactments identified by any party in this case that would evidence the adoption of a particular public policy in favor of imposing a duty of care on an architect under these circumstances.[14]

Having considered all the relevant factors, we cannot conclude that the imposition of a new common law duty on architects is warranted in these circumstances. This seems particularly true in this case where the general contractor had a duty to inspect and an absolute right to control the subcontractor's work and to warrant and guarantee that work and where the injured third parties could (and did) obtain relief from the general contractor for his breach of that duty. In making their request, the Smiths ask this Court to fundamentally alter the obligations of architects working in Texas and to ignore the language contained in contracts that are used industry wide. Although there may be compelling reasons for expanding an architect's duty to use reasonable care in circumstances like those presented in this appeal, the decision regarding whether to undertake such a massive expansion is better left to courts of higher jurisdiction. *See Morgan Chase*, 302 S.W.3d at 535. Accordingly, we decline to recognize a new common-law duty under the circumstances present in this case.

For these reasons, we conclude that the Architects did not owe a duty to the Smiths and sustain the Architects' issue on appeal.

---

[14] As an alternative argument supporting the jury's determination, the Smiths contend that the Architects owed them a duty of care because the Architects were agents of the Maxfields. Essentially, the Smiths argue that the Architects assumed "the duty of care by virtue of their contract" with the Maxfields, that the Architects' negligence "is directly imputed to the Maxfields," and that the duty of care was, therefore, owed to them "through that agency relationship." However, the Smiths refer to no cases or legal authority supporting that assertion, and we have been unable to find any.

25

**Response to the Dissent**

The dissent attempts to minimize the import of its suggestion that a duty should be created in this case by stating that the duty applies only in "the very limited circumstances present here." Specifically, the dissent states that it would only conclude that a duty exists "where the defects were open, obvious, observable to the architect, implicated critical safety and structural integrity concerns, involved significant deviations from the architect's own design drawings despite the fact that preapproval of any such deviation was required, and were overlooked by an architect who contracted to provide contract administration services."

While constructing its narrow holding, however, the dissent employs an overbroad approach. The dissent attempts to minimize the burden imposed on architects by limiting the duty to "observable" and "significant" deviations that implicate "critical safety and structural integrity concerns." Rather than limiting the circumstances in which an architect may be held liable, the dissent would essentially impose a new and wide-ranging duty upon architects. The factors identified by the dissent are fact issues that would likely survive summary-judgment challenges. Thus, provided that a plaintiff frames his cause of action in terms of the factors identified by the dissent, the architect would likely face the prospect of full litigation in order to exonerate himself in cases in which the architect very well owes no duty to the plaintiff. Accordingly, the analysis suggested by the dissent would not really seem to limit itself to the specific circumstances identified by the dissent. In addition, it is unlikely that one would know a defect's significance until the defect is actually identified, and once a failure has occurred, nearly any defect could be argued to be significant. It would be a considerable burden, then, to require an architect to have detected all defects that, in hindsight, turn out to be "significant" to a "critical" issue.

Moreover, although the dissent cites to many cases as support for creating a duty under the circumstances in this case, none of the cases cited by the dissent provides any support for the conclusion that the Architects, despite having no right of control over the construction project, owed a duty *to third parties* to discover a defect in that construction. First, the dissent relies on *First National Bank of Akron v. Cann*, 503 F. Supp. 419 (N.D. Ohio 1980), *aff'd*, 669 F.2d 415 (6th Cir. 1982), for the supposition that the Architects can be liable to third parties for failing to comply with their duty to endeavor to guard against deficiencies as well as support for its evocative concept that our holding will allow architects to turn a "blind eye" to construction defects and escape liability of any kind. In that case, the court stated that an architect should not be "allow[ed] to close his eyes on the construction site, refrain from engaging in any inspection procedure whatsoever, and then disclaim liability for construction defects that even the most perfunctory monitoring would have prevented." *Id.* at 436. In making that statement, the court in *Cann* was addressing the extent of the architect's contractual obligation to observe the construction and to make periodic visits to the site. However, the court in *Cann* was discussing the obligation that the architect owed to the owner of the property in question arising from the contract that the owner and the architect entered into. *Id.* at 435-37. No suggestion was made that the architect owed any duty to individuals that were not party to the contract. Accordingly, the dissent's utilization of the impassioned language in *Cann* regarding whether an architect may ignore his responsibility to endeavor to guard and then later disclaim all liability paints an incomplete picture because it fails to provide the context in which the statement was made: in response to an architect seeking to escape liability to the property owners with whom he had contractually agreed to protect.

Similarly, the dissent cites *Hunt v. Ellisor & Tanner, Inc.*, 739 S.W.2d 933 (Tex. App.—Dallas 1987, writ denied), as support for its assessment of the scope of the Architects' duty. In *Hunt*, the owners of a construction project sued the architects *with whom they had contracted* for defects in the construction of a parking deck. *Id.* at 935. The owners asserted a breach of contract claim. *Id.* The court held that while the architects did not insure or guarantee the general contractor's work, they could nonetheless be found liable based on their contract with the owners under which they agreed to "endeavor to guard" against defects. *Id.* at 937. Although the dissent characterizes *Hunt* as presenting "essentially the same argument," there were no third-party visitors involved in *Hunt*. Thus, the court did not address the issue of whether the architect's duty under the contract would have extended to a third party as a common law duty. *See id.*; *see also Romero*, 881 S.W.2d at 528 (explaining that holding in *Hunt* only applies to cases in which property owner is suing architect for breach of contract that both parties entered into).[15]

The dissent then cites *Dukes*, 252 S.W.3d 586, for the proposition that the Architects are not shielded from liability even though the Smiths are not third-party beneficiaries of the contract. In *Dukes*, four people had drowned in a city-owned fountain, and their representatives sued the architects who had contracted with the city to assist with the fountain's earlier renovation. *Id.* at 590. However, the court concluded that the architects' contract with the city did not impose a duty to "report or make safe any hazards that they may have detected in the" fountain. *Id.* at 594-95. As

---

[15] The dissent also cites *Gables CVF, Inc. v. Bahr, Vermeer & Haecker Architect, Ltd.*, 506 N.W.2d 706 (Neb. 1993) as support for the proposition the Architects are liable in this case. However, as with *Hunt v. Ellisor & Tanner, Inc.*, 739 S.W.2d 933 (Tex. App.—Dallas 1987, writ denied), *Gables CVF* addressed whether an architect owed a duty to the *property owner* to report deviations from the building design plans. 506 N.W.2d at 710.

28

a result, the court did not proceed to address the issue of whether such a duty would have extended to third-party visitors.  *See id.*

The dissent relies on *Council of Co-Owners Atlantis Condominium, Inc. v. Whiting-Turner Contracting Co.*, 517 A.2d 336 (Md. 1986), to conclude that an architect's duty of care extends to "those persons foreseeably subjected to the risk of personal injury" resulting from the architect's negligence.  *See id.* at 338 (limiting duty of care to persons subjected to risk "because of a latent and unreasonably dangerous condition").  However, unlike the present case, the architects in *Whiting-Turner* did have control over the construction of the building.  Specifically, the architects either were "supervising architects" or had agreed by contract "to inspect the building and to certify to the Building Inspection Department of Ocean City, Maryland, that the building was constructed pursuant to the approved building permit in accordance with the plans and specifications submitted with the original permit application and that the building was ready for occupancy."  *Id.* at 339.  Thus, *Whiting-Turner* does not provide precedent for this case, where the Architects, by contract, were not responsible for the finished construction but merely agreed to "endeavor to guard" against defects.  In any event, *Whiting-Turner* is not a Texas case and is, therefore, not controlling to the outcome of this case.

Finally, the dissent relies on an Iowa case—*McCarthy v. J.P. Cullen & Son Corp.*, 199 N.W.2d 362 (Iowa 1972)—for its assertion that an architect cannot rely on the provisions of its contract with a property owner to avoid liability to a third party for negligence.  However, that case involved *negligent design*.  *See id.* at 370; *see also Abalos v. Oil Dev. Co.*, 544 S.W.2d 627, 633 (Tex. 1976) (explaining that person has duty to prevent injury to others when he negligently creates

29

dangerous situation). This case is not a negligent design case, and the Architects did not create the construction defect. Thus, *McCarthy* does not provide any precedent applicable to this case.

## CONCLUSION

Having sustained the Architects' issue on appeal, we reverse the judgment of the district court and render judgment that the Smiths take nothing in their suit against the Architects.

_____

David Puryear, Justice

Before Chief Justice Jones, Justices Puryear, Pemberton, Henson, Rose, and Goodwin;
    Dissenting Opinion by Justice Henson, joined by Chief Justice Jones

Reversed and Rendered on Motion for Rehearing

Filed: August 5, 2011